In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 12-2316 & 12-2460

BIG RIDGE, INC., JERAD BICKETT, *et al.*,

*Petitioners*,

*v.*

FEDERAL MINE SAFETY AND
HEALTH REVIEW COMMISSION, *et al.*,

*Respondents.*

Petitions for Review of an Order
of the Federal Mine Safety and Health Review Commission.

ARGUED DECEMBER 4, 2012—DECIDED APRIL 26, 2013

Before BAUER and HAMILTON, *Circuit Judges*, and THARP, *District Judge.*[*]

HAMILTON, *Circuit Judge.*   Under the Federal Mine Safety & Health Act of 1977 ("the Mine Safety Act"), the Secretary of Labor is charged with protecting the health and safety of the nation's miners, acting through

[*] The Honorable John J. Tharp of the Northern District of Illinois, sitting by designation.

the Federal Mine Safety and Health Administration ("MSHA"). Regulations issued under the Mine Safety Act require mine operators to report to MSHA all mine-related injuries and illnesses suffered by mine employees. In October 2010, MSHA acted on a new and broader interpretation of existing regulations. It informed thirty-nine mine operators that, in addition to providing the injury and illness reports, they would be required to permit an MSHA inspector to review employee medical and personnel records during their next inspections. Reviewing employee medical and personnel records would enable MSHA to verify that the mines have not been under-reporting miners' injuries and illnesses.

Two mine operators refused to provide the records. MSHA issued citations and imposed monetary penalties for failing to comply with the demand for the records. The mine operators challenged MSHA's authority to demand the records and to impose penalties under the Mine Safety Act and relevant regulations. The mine operators argued that MSHA is not authorized to require them to produce records beyond those that regulations specifically require them to maintain. The challenge was heard by an administrative law judge and reviewed by the Federal Mine Safety and Health Review Commission ("the Commission"), both of which found that the document demands and enforcement were lawful under 30 U.S.C. § 813(h) and 30 C.F.R. § 50.41. The mine operators petitioned for review by this court, joined by a group of mine employees who intervened before the Commission to raise personal privacy challenges to the document demands.

On petitions for judicial review, the mine operators and miners challenge the document demands on several grounds. They contend: (1) that MSHA does not have the authority to require mines to comply with the demands under the Mine Safety Act or relevant regulations; (2) that the relevant regulation, 30 C.F.R. § 50.41, is not a reasonable interpretation of the Mine Safety Act and was not properly promulgated; (3) that the document demands infringe the mine operators' Fourth Amendment right not to be searched without a warrant; (4) that the demands violate the miners' Fourth Amendment privacy rights in their medical records; (5) that the daily penalties MSHA imposed for failure to comply violate the mine operators' Fifth Amendment right to due process of law; and (6) that the demands conflict with a variety of other federal and state laws.

We agree with the Commission that MSHA acted within its statutory and constitutional authority both in demanding information that would permit MSHA to verify the accuracy of mine operators' injury reports and in issuing citations and monetary penalties when mine operators refused to comply. We deny this petition for review of the judgment of the Commission.

I. *Regulatory and Factual Background*

   A. *Federal Regulation of Mine Safety*

The Federal Mine Safety and Health Act of 1977, Pub. L. No. 95-164, superseded two prior pieces of mine legislation, the Federal Coal Mine Health and Safety Act of 1969

("the Coal Act"), Pub. L. No. 91-173, and the Federal Metal and Nonmetallic Mine Safety Act of 1966 ("the Metal Act"), Pub. L. No. 89-577. The 1977 Mine Safety Act covers all types of mines addressed by these prior acts. In passing the new Mine Safety Act, Congress acted to strengthen the government's authority to regulate mines in response to a joint committee of Congress finding that after "ten years of enforcement of the Metal [A]ct, and six years of enforcement of the Coal Act . . . fatalities and disabling injuries in our nation's mines are still unacceptably and unconscionably high." S. Rep. No. 95-181, at 7 (1977), reprinted in 1977 U.S.C.C.A.N. 3401, 3407. Recognizing "an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines in order to prevent death and serious physical harm, and in order to prevent occupational diseases originating in such mines," Congress passed the 1977 Mine Safety Act to strengthen the government's ability to ensure mine safety. 30 U.S.C. § 801(c). Congress found that the stronger Mine Safety Act was needed because earlier laws had proven too weak and mines still had appalling safety records. At the time the Mine Safety Act passed, an average of one miner died and sixty-six miners were injured each day, and the incidence of work-related injuries and illnesses for miners exceeded the "all-industry" rate at the time by about 14 percent. S. Rep. No. 95-181, at 4, 7, 1977 U.S.C.C.A.N. 3404, 3407.

The Mine Safety Act created the Mining Enforcement and Safety Administration ("MESA"), which has been

renamed the Mine Safety and Health Administration ("MSHA"). The Act gave MSHA broad authority to ensure the safety of mines, including the authority to inspect mines and collect records and reports, 30 U.S.C. § 813, to promulgate mandatory health and safety standards and rules, § 811, and to enforce safety standards and rules through citations and penalties, § 814. Most relevant here, section 813(a) authorizes MSHA to inspect and investigate mines, and section 813(h) imposes reporting and record-keeping requirements upon mine operators.

Sections 813(a) and 813(h) provide the statutory basis for MSHA's collection and reporting of data relating to mine safety and health. To implement these sections, regulations were promulgated detailing a system of required reporting for mines. Under the "Part 50" regulations, mines must immediately report serious injuries or incidents, 30 C.F.R. § 50.10; must report all mine accidents, injuries, and occupational illnesses as they occur on forms called 7000-1 reports, § 50.20; and must report employee work hours and total coal production for each quarter on forms called 7000-2 reports, § 50.30. MSHA uses Part 50 reports to calculate for all mines the "Incidence Rates," which are the number of injuries or illnesses per employee hour worked, and "Severity Measures," which take into account the severity of injuries per employee hour worked. See 30 C.F.R. § 50.1. These reports permit MSHA "to investigate, and to obtain and utilize information pertaining to, accidents, injuries, and illnesses occurring or originating in mines." *Id*. MSHA also makes all of this compiled data

publicly available on its website. See MSHA Statistics, www.msha.gov/stats/statinfo.htm (last visited April 24, 2013).

In addition to requiring mine operators to submit the 7000-1 and 7000-2 reports, the Part 50 regulations require mine operators to maintain copies of those records and to permit MSHA to verify the information in those reports. The provision at the center of the controversy here is section 50.41, which permits MSHA to verify the information in the reports:

> Upon request by MSHA, an operator shall allow MSHA to inspect and copy information related to an accident, injury or illnesses which MSHA considers relevant and necessary to verify a report of investigation required by § 50.11 of this part or relevant and necessary to a determination of compliance with the reporting requirements of this part.

30 C.F.R. § 50.41.

The Mine Safety Act authorizes MSHA to enforce these reporting requirements through citations and orders, 30 U.S.C. § 814(a), "failure to abate" penalty fees when a mine has not abated a previously-cited violation, § 814(b), and withdrawal orders, which require a mine to be evacuated and shut down, § 814(d). Mine operators can challenge citations and orders in a hearing before an administrative law judge whose decision is appealable to the Commission. § 815(d). While the contest hearing is pending, mine operators can request temporary relief from certain penalties and other orders. § 815(b)(2). Mine operators can petition for

review of final orders of the Commission by a federal court of appeals, § 816(a)(1), as petitioners have done here.

B. *Part 50 Audits*

During inspections of several mines in October 2010, MSHA inspectors presented letters ordering the mine operators to have several pieces of information and documents related to the 7000-1 and 7000-2 reports from July 1, 2009 through June 30, 2010 "available for review" during their next inspections. The demanded documents included:

1. All MSHA Form 7000-1 Accident Reports

2. All quarterly MSHA Form 7000-2 Employment and Production Reports

3. All payroll records and time sheets for all individuals working at your mine for the covered time period

4. The number of employees working at the mine for each quarter

5. All medical records, doctor's slips, worker compensation filings, sick leave requests or reports, drug testing documents, emergency medical transportation records, and medical claims forms in your possession relating to accidents, injuries, or illnesses that occurred at the mine or may have resulted from work at the mine for all individuals working at your mine for the period of July 1, 2009 through June 30, 2010.

Joint App. 32.

MSHA sent this letter to thirty-nine mines, including two mines operated by Peabody Energy Company. Counsel for MSHA later told the Commission that the thirty-nine mines were selected because, "but for supposedly low severity measures . . . they would have met the criteria for a potential pattern of violations screening." Comm'n Tr. at 45. MSHA designates a mine as having a "pattern of violations" ("POV") when the mine has established a history of significant and substantial violations of mandatory safety or health standards. 30 U.S.C. § 814(e); see also 30 C.F.R. §§ 104.1 *et seq*.

Once a mine is in POV status, MSHA has increased authority to institute safety precautions, which can involve burdensome administrative requirements and disruption of mine activities. See 30 U.S.C. § 814(e) (authorizing withdrawal orders after a POV notice); 30 C.F.R. § 104.4 (requiring mine operators to post all POV notifications and listing actions a mine operator may be required to take upon issuance of a POV notice). Thus, MSHA had determined, based on other data it collected, that these thirty-nine mines' Incidence Rates and Severity Measures were statistically lower than MSHA's calculations indicated they should be. MSHA suspected that the mines might be under-reporting injuries to avoid the increased scrutiny that would come with POV status. Reviewing employee medical and personnel records could enable MSHA to determine if more employees had been injured or ill than the mines had reported.

When MSHA representatives first presented the initial demand letter to two Peabody-owned mines,

mine personnel complied with the requests to produce the 7000-1 and 7000-2 reports and the number of employees working at the mine for each quarter (items 1, 2, and 4), but they refused to produce payroll and medical records (items 3 and 5). MSHA sent another letter on October 28, 2010, demanding the same list of documents. Counsel for petitioner Peabody and another mine operator, petitioner Big Ridge, responded to the October 28 letter with a letter explaining that the mine operators would not comply with the medical and payroll record demands because they did not believe the demands were within MSHA's authority. They also expressed concern for the privacy rights of miners and privacy of the mines' "confidential business information." Joint App. 70, 72.

MSHA inspectors returned to two mines operated by Peabody on November 9, 2011, and again demanded the medical and personnel records. The mine operators again refused, and the inspectors issued citations under 30 U.S.C. § 814(a). With the dispute having already been teed up, the citations listed the failure-to-abate period as fifteen minutes, meaning that the mine operators would have fifteen minutes from the time the citation was issued to comply with the underlying demand before MSHA could begin imposing failure-to-abate penalties under section 814(b). When, after fifteen minutes passed, mine personnel again refused to produce the records, the inspectors issued failure-to-abate orders under section 814(b). MSHA later imposed a penalty fee of $4,000 per day in conjunction with the failure-to-abate order on one mine, Peabody Midwest.

The mine operators contested the orders and citations, and the case was heard by an administrative law judge. MSHA stayed the daily failure-to-abate penalties while the hearing was pending. In two opinions issued on May 20, 2011, the ALJ affirmed the citations and orders, finding that (1) the medical and personnel records MSHA sought were relevant to the mines' compliance with reporting regulations, (2) MSHA was authorized to demand the records as part of a Part 50 audit, and (3) the demands did not impose an unreasonable burden on the mine operators. The mine operators appealed to the Commission, which consolidated several similar cases. A group of miners who objected to the record demands intervened and filed briefs.

The Commission affirmed the orders and citations on May 24, 2012. The Commission held that MSHA was authorized to make the demands under sections 813(a) and (h) and Part 50.41. The Commission also held that the demands did not violate either the mine operators' or the miners' privacy or Fourth Amendment rights, that the demands did not violate mine operators' Fifth Amendment right to due process, and that the demands did not conflict with other federal and state laws. One commissioner dissented, arguing that MSHA would need to undertake additional notice-and-comment rulemaking to have the authority to demand the records without offending the Fourth or Fifth Amendments. The mine operators and miners petitioned for review of the Commission's decision, raising all of the objections they raised before the Commission.

II. *Analysis*

We have jurisdiction under 30 U.S.C. § 816(a)(1) to review orders of the Commission. Petitioners raise a number of challenges to the Commission's order affirming MSHA's authority to demand the medical and personnel records and enforce compliance with them. We first consider whether the Mine Safety Act and relevant regulations give MSHA the statutory and regulatory authority to require mine operators to produce employee medical and personnel records that mine operators are not otherwise required to maintain. We conclude first that under 30 C.F.R. § 50.41, MSHA may require mine operators to permit MSHA inspectors to review and copy employee medical and personnel records necessary to verify the mine operators' compliance with other reporting obligations. We also conclude that section 50.41 is a valid exercise of the agency's authority under sections 813(a) and 813(h) of the statute. Second, we then consider petitioners' Fourth Amendment challenges to the demands, concluding that the demands do not impermissibly infringe on the mine operators' Fourth Amendment rights and do not impermissibly infringe on the privacy of the miners' personal information. Third, we consider whether imposing daily penalties before the opportunity for Article III judicial review of the validity of the underlying violation infringes the mine operators' right to due process; we conclude that it does not. Fourth, we explain why the document demands do not impermissibly conflict with other federal and state laws.

A.  *Statutory and Regulatory Authority*

MSHA sought to review mine employee medical records under the authority of a Part 50 regulation, section 50.41. The mine operators and miners argue that neither section 50.41 of the regulations nor section 813(a) or section 813(h) of the statute permits the MSHA demands. Petitioners argue that none of those provisions require mine operators to produce documents they are not required to maintain by statute or regulation, and they are not required to maintain the records demanded here. They also argue that even if the text of section 50.41 authorizes the demands, the regulation is an unreasonable interpretation of the Mine Safety Act. They also challenge MSHA's promulgation and implementation of the regulation.

We disagree with these challenges. The broad language of section 50.41 authorizes MSHA to require mine operators to permit inspectors to review and copy employee medical and personnel records that would permit MSHA to verify the accuracy of mine operators' 7000-1 and 7000-2 reports. Moreover, section 50.41 is valid because the relevant sections of the Mine Safety Act permit MSHA to promulgate a regulation that would authorize these record demands. The Act grants MSHA broad inspection and document review powers, including the power to "reasonably require" mines to provide information that would enable MSHA to "perform [its] functions under this chapter." 30 U.S.C. § 813(h). The demands here fall within the scope of these powers because verifying the accuracy of mine

operators' injury reports is necessary for MSHA to fulfill its duties of ensuring miner health and safety. None of the petitioners' challenges to the validity of the regulation or the MSHA's interpretation of the statute persuade us otherwise.

1.   *Section 50.41 Authorizes the Demands*

Section 50.41 authorizes MSHA to require mine operators to permit MSHA agents to inspect and copy employee medical and personnel records to verify mine operators' compliance with reporting requirements under Part 50. Section 50.41 requires mine operators to permit MSHA to "inspect and copy information related to an accident, injury or illnesses which MSHA considers relevant and necessary to . . . a determination of compliance with the reporting requirements of this part." 30 C.F.R. § 50.41.

We believe this language is straight-forward. This section authorizes the demands here because employee medical and personnel records are "relevant and necessary" for MSHA to determine whether mine operators are accurately reporting mine-related injuries and illnesses on 7000-1 reports. The Mine Safety Act relies in the first instance on mines to self-report all injuries, so it is possible for mine personnel to decide to leave out some employees' work-related injuries or illnesses by not filing out a 7000-1 form for a given injury or illness. Under-reporting in this way could be beneficial to a mine because having lower Incidence Rates and Severity Measures could lessen the scrutiny the mine receives

from MSHA. Moreover, the mines here used procedures for filing 7000-1 forms that left much room for error and omissions. Several safety managers from the mines testified before the ALJ that they had no way of ensuring that they were aware of all injuries and illnesses suffered by employees in the mine — they reported to MSHA only what others in the mine reported to them. Thus, if MSHA were to rely on the 7000-1 forms alone, it would risk missing additional injuries and illnesses and would not have the basis from which to take action against mines that were under-reporting. While the Mine Safety Act relies primarily on self-reporting for injuries and illnesses, MSHA is not required to take the self-reports on faith. Without the records demanded in these audits, MSHA may not even be aware that a mine is under-reporting. Moreover, without knowing whether mines are under-reporting injuries and illnesses, MSHA would not have an accurate view of the frequency and types of injuries and illnesses caused by mine work, thus hindering its ability to fulfill its duty to develop policies and standards to ensure mine safety.

The records MSHA demanded in the disputed inspections here would help alleviate these problems. The medical records could reveal work-related injuries or illnesses beyond those reported in the 7000-1 reports. For example, doctors' notes that a mine collected from employees missing work could reveal ongoing work-related illnesses, such as pneumoconiosis, or workers' compensation records could reveal that the mine subsidized an employee's treatment for a work-related injury that it had not reported in a 7000-1 report. Personnel

records, such as timesheets or other records of the hours employees had worked, would enable MSHA to ensure that it used the correct total work hours in calculating Incidence Rates and Severity Measures. (This too is important, for mines could artificially lower their Incidence Rates and Severity Measures by reporting more worked hours than were actually worked. Both measures are calculated by dividing by work hours.)

The agency's explanatory preface issued when section 50.41 was first promulgated confirms that the agency (then known as MESA) intended the broad language of section 50.41 to authorize demands such as these:

> Section 50.41 requires operators to allow MESA to inspect or copy any information the agency thinks may be relevant and necessary for verification of reports or for determination of compliance with Part 50. In effect, it allows MESA to copy company medical records, employment records, and other company information.

> MESA believes that this provision is necessary if it is to be able to develop epidemiological data essential to development of effective health standards. It is also necessary if MESA is to be able to discover instances of intentional violation of statutory or regulatory requirements. It will allow MESA to control the data flow, rather than depend on operator filtered records.

42 Fed. Reg. 55568, 55569 (1977). We agree. The medical and personnel records are relevant and necessary for MSHA to determine whether the mines are complying with the reporting requirements of part 50.

Our analysis is not altered by *Sewell Coal Co. v. Secretary of Labor*, an early decision in which an administrative law judge held that section 50.41 did not authorize MSHA to inspect certain employee records, including medical and personnel records similar to those demanded here. 1 FMSHRC 864, 869-73 (1979). Although the ALJ's analysis and decision support petitioners' arguments here, we are not bound by, nor need we defer to, that ALJ's decision, as it is not the "agency's construction of the statute which it administers." See *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984); see also *Olson v. Fed. Mine Safety & Health Review Comm'n*, 381 F.3d 1007, 1014 (10th Cir. 2004) (under Mine Safety Act, ALJ's "decision is not entitled to deference, however, because the Commission did not review the ALJ's decision, and the decision is therefore not binding precedent under the Commission's rules,"), citing 29 C.F.R. § 2700.72 (currently 29 C.F.R. § 2700.69(d)) ("A decision of a Judge is not a precedent binding upon the Commission.").

Nevertheless, we recognize that the ALJ gave serious consideration to the problem, and we can and should consider the merits of his reasoning. The reason that *Sewell Coal* is not persuasive is that the ALJ's decision rested on constitutional avoidance grounds that are no longer pertinent. The ALJ determined that neither section 50.41 nor section 813 of the statute permitted MSHA to inspect the records without a warrant because he interpreted both sections in a way that he intended to avoid any potential conflict with the Constitution. *Sewell Coal*, 1 FMSHRC at 871, 873. *Sewell Coal*, however, came

before the Supreme Court held in *Donovan v. Dewey* that MSHA may conduct warrantless inspections under the Mine Safety Act and that such inspections do not offend the Fourth Amendment. 452 U.S. 594, 602-06 (1981). The Supreme Court's reasoning in *Donovan* altered the constitutional analysis applicable to MSHA inspections. We analyze the constitutionality of the record demands in light of *Donovan* and other cases below when we consider the mine operators' and miners' Fourth Amendment challenges. On the issue of statutory and regulatory authority, though, *Donovan* undermined the reasoning of *Sewell Coal*.

### 2. *Validity of Section 50.41 Under the Mine Safety Act*

Since section 50.41 authorizes MSHA to demand the records at issue here, we now turn to the statutory validity of section 50.41 as a regulation implementing the Mine Safety Act. The mine operators and miners argue that, even if section 50.41 authorizes the demands, they still exceed the bounds of authority given to MSHA in the Mine Safety Act because section 813 cannot be read to permit MSHA to require mines to produce employee medical and personnel records.

We disagree. We read section 813, particularly subsections 813(a) and 813(h), to authorize MSHA to promulgate a regulation that requires mine operators to permit MSHA to review files that are relevant for verifying compliance with other reporting requirements. Because section 50.41 is a regulation promulgated by the Secretary under the authority of the Mine Safety Act, we apply the *Chevron* two-step analysis to determine whether

the regulation and the demands it authorizes are a permissible construction of the statute. See *Chevron*, 467 U.S. at 842-43.

First, we consider whether "Congress has directly spoken to the precise question at issue," here, whether the Secretary may promulgate a regulation and interpret it to require mine operators to produce employee records that they are not otherwise required to maintain but that are necessary or relevant for MSHA to verify compliance with other reporting requirements. *Chevron*, 467 U.S. at 842-43. If the Mine Safety Act clearly addresses this question, then we must "give effect to the unambiguously expressed intent of Congress." *Id*. If the Act does not directly answer the question, we consider whether the Secretary's answer — that she is so authorized — is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.

Section 813 is the source of MSHA's broad inspection power under the Mine Safety Act. Specifically, section 813(a) grants MSHA broad authority to inspect and investigate mines for several purposes, including:

> obtaining, utilizing, and disseminating information relating to health and safety conditions, the causes of accidents, and the causes of diseases and physical impairments originating in such mines, . . . and determining whether there is compliance with the mandatory health or safety standards or with any citation, order, or decision issued under this subchapter or other requirements of this chapter.

30 U.S.C. § 813(a).

Related to this inspection authority, section 813(h) imposes duties on mine operators to provide reports, keep records, and provide information on demand of the Secretary:

> In addition to such records as are specifically required by this chapter, every operator of a coal or other mine shall establish and maintain such records, make such reports, and provide such information, as the Secretary . . . may reasonably require from time to time to enable him to perform his functions under this chapter. . . .

30 U.S.C. § 813(h).

In the first step of *Chevron* analysis, the statutory language does not directly tell us whether MSHA may require mines to produce employee records, beyond those they are already required to maintain, to verify reporting compliance, as section 50.41 authorizes. Certainly section 813(h) unambiguously requires mines to provide MSHA with records, reports, and information beyond what mines are otherwise required to maintain. The sentence's opening clause makes clear that the reporting requirements under that section are "[i]n addition to such records as are specifically required by this chapter." But the question here is a little more specific: whether MSHA can require mines to produce employee records, beyond those required to be maintained, *for the purpose of verifying other reporting requirements*, as section 50.41 permits. Section 813(h) provides that MSHA may "reasonably require" mines to produce non-required records when the additional informa-

tion would enable MSHA "to perform [its] functions" under the Act. This text permits MSHA to make information demands for a wide range of purposes — any reasonable requirement that would help MSHA fulfill the purposes of the Mine Safety Act. There is a little room for reasonable argument about whether the statute authorizes MSHA more specifically to require mines to provide documents that would verify compliance with other reporting requirements.

The statute certainly does not forbid MSHA's actions, but for purposes of argument, therefore, we will proceed to the second step of *Chevron* analysis and determine whether the Secretary's position is a "permissible construction" of the statute. 467 U.S. at 843. We find that it is. Section 813(h) permits MSHA to require mines to produce documents not otherwise required to be maintained as long as it does so "reasonably" and in order to "enable [it] to perform [its] functions under the Act." Section 50.41 and the document demands here are well within those bounds. First, it is *reasonable* for MSHA to require mines to provide information to verify required reports. To preclude MSHA from doing so would reduce the value of the required reports. Moreover, the specific demands made here are limited in scope, manner, and time. Their scope is tailored to include only information that would be needed to verify compliance with 7000-1 and 7000-2 reports (information related to accidents, injuries, illnesses, and total employee work hours). The manner is reasonable, for MSHA is demanding only to inspect and copy the relevant records, not to rummage through mine offices.

The time limits are reasonable, covering records from only one year.

Second, MSHA's functions under the Act include verifying the accuracy of required reports. Verifying compliance with the Mine Safety Act and relevant regulations is one of the express purposes for which section 813(a) authorizes MSHA to inspect and investigate mines. These document demands do just that — enable MSHA to verify the accuracy of mine injury reports. Since section 813 gives MSHA the authority to make reasonable records demands that it deems necessary to fulfill its purposes under the statute (which expressly include verifying compliance), section 50.41 and the demands here fall within the limits on MSHA's authority imposed by section 813. MSHA's interpretation that the Act permits section 50.41 and these demands is certainly not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844.

Petitioners point to a new bill in the House of Representatives that would amend the Mine Safety Act to give MSHA express subpoena powers, as evidence that the current statutory language does not permit the record demands at issue here. See Robert C. Byrd Mine Safety Protection Act of 2013, H.R. 1373 113th Cong. § 102 (amending Mine Safety Act to give MSHA general subpoena power). Citing a statement by the bill's sponsor, petitioners argue that the proposed extension of general subpoena power is intended to address the "[p]roblem [that] MSHA lacks subpoena power for investigations and inspections." See Committee on Education and

the Workforce Democrats, H.R. 1373: The Robert C. Byrd Mine Safety Protection Act of 2013, at http://democrats.edworkforce.house.gov/bill/robert-c-byrd-mine-safety-protection-act-2013 (last visited April 24, 2013). Petitioners argue that this proposed legislation highlights the fact that MSHA currently lacks such power. We are not persuaded. This legislative attempt to expand MSHA's powers does not require us to interpret its existing powers narrowly. There are plenty of possible reasons to propose such legislation besides an understanding that MSHA currently could not demand the records here. The fact that this issue is being litigated in these petitions for review could prompt MSHA or others to undertake legislative efforts to clarify and support its understanding of its powers. The proposed legislation does not change our determination that the current statutory text supports MSHA's actions here.

Before concluding the *Chevron* discussion, we note that petitioners argue that *Chevron* deference is inappropriate in this case because MSHA has held inconsistent positions as to whether the Mine Safety Act authorizes the record demands. We are not persuaded. First, as a matter of law, "inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework." *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 981 (2005). Second, as a matter of fact, petitioners have not shown that the agency's position has been inconsistent. As evidence of inconsistency, petitioners rely on a letter written by Edward Clair, the Associate Solicitor for

Mine Safety and Health, to the National Stone Association in 1987. The letter responded to an inquiry about "the limits on MSHA's legal authority to examine 'payroll and personal files containing medical and other information not required to be maintained by Part 50.'" Joint App. 75. Petitioners read portions of the letter as limiting MSHA's authority to inspect personnel files to those records required to be maintained under Part 50. But the letter concluded: "MSHA in Part 50 audits routinely seeks access to information related to accidents and injuries which the Agency believes is relevant and necessary to verification of compliance with Part 50. It is our position that as long as these audits do not constitute the 'wholesale' warrantless search proscribed [by a recent decision of the Commission, *Sewell Coal Co. v. MSHA*, 1 FMSHRC 864 (1979), discussed above], they are entirely permissible." Joint App. 76-77. We read the 1987 letter as actually consistent with MSHA's current position.

### 3. *Petitioners' Other Objections*

Petitioners object to this reading of the statute and regulations on two other grounds: (1) that under section 813(h) MSHA can reasonably require records "from time to time" only by promulgating a regulation via notice-and-comment rulemaking, and (2) that MSHA cannot rely on section 50.41 to authorize the demands because section 50.41 itself was not properly promulgated. Neither of these objections is persuasive.

First, the argument that section 813(h) requires notice-and-comment rulemaking before any set of records or

information falls under its scope does not make a difference here. MSHA (actually, its predecessor MESA) did in fact promulgate a regulation specifically stating that mines must make certain records available for inspection: section 50.41 itself. Moreover, section 813(h) does not indicate that MSHA must promulgate a specific regulation via notice-and-comment rulemaking any time it wishes to make records subject to section 813(h). The section does not say MSHA "may reasonably require through rulemaking" but instead says only "from time to time." We interpret the phrase as more likely to mean that demands may be made from time to time.

On this point, both sides claim support from a particular episode in the legislative history: that Congress enacted the Mine Safety Act without language present in earlier bills requiring operators to maintain records "pursuant to regulations issued by the Secretaries." See H.R. Conf. Rep. No. 95-655, at 45 (1977), reprinted in 1977 U.S.C.C.A.N. 3485, 3493. The Senate committee report stated that the language was removed "because the conference substitute provides elsewhere for certain necessary recordkeeping," an explanation that does not add much to either side's argument. We read the plain text of the statute as not requiring MSHA to promulgate specific rules whenever it wants to be able to make reasonable demands for records under section 813(h). Even if it were required to do so, it has met that obligation with section 50.41.

Second, it is far too late to challenge the validity of section 50.41 with an argument that the Secretary did not

adequately explain the rationale for the regulation. Upon promulgating a rule, agencies must provide a "concise general statement" of the basis and purpose of the rule. 5 U.S.C. § 553(c). The Mine Safety Act requires that any court challenges to the validity of a regulation be brought within sixty days of the rule's promulgation. 30 U.S.C. § 811(d). Section 50.41 was promulgated on December 30, 1977.

For all these reasons, we find that the Mine Safety Act and relevant regulations authorize MSHA to require mine operators to permit MSHA to review the employee medical and personnel records demanded here.

B. *Fourth Amendment*

Petitioners also challenge the record demands on Fourth Amendment grounds. The mine operators argue that the demands violate their right to be free from warrantless searches, seeking to distinguish these demands from the warrantless mine inspections permitted under *Donovan v. Dewey*, 452 U.S. 594 (1981). The miners argue that the demands invade their personal privacy. Although the mine operators have framed the issue primarily in terms of warrantless searches, we conclude that the record demands are best understood, in constitutional terms, as administrative subpoenas. The document demands do not violate mine operators' Fourth Amendment rights because they are limited in scope and reasonably necessary to keep mines safe. The demands also do not violate miners' Fourth Amendment rights because MSHA is legally constrained (and

took precautionary measures) to keep miners' medical information confidential. Miners' interest in keeping their private information out of the wrong hands is out-weighed by the government's interest in MSHA's purpose — miner safety and health.

1. *Mine Operators*

Petitioners argue that the record demands here are warrantless searches and prohibited by the Fourth Amendment. A government agency typically must secure a warrant before conducting a search of commercial premises or a business. *See v. City of Seattle*, 387 U.S. 541 (1967). A warrant is not always necessary, though, to search a business operating in a pervasively regulated industry because businesses in those industries have lower expectations of privacy. *New York v. Burger*, 482 U.S. 691, 702 (1987) (in closely regulated industries, "where the privacy interests of the owner are weakened and the government interests in regulating particular business are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment"); *United States v. Biswell*, 406 U.S. 311 (1972); *Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970).

In *Donovan v. Dewey*, the Supreme Court held that mining falls into this category — it is so pervasively regulated that it should be excepted from the warrant requirement for the purposes of regulating mine safety. The Court observed that the 1977 Mine Safety Act regulated "industrial activity with a notorious history of

serious accidents and unhealthful working conditions," and that the Act's regulation of mines "is sufficiently pervasive and defined that the owner of such a facility cannot help but be aware that he 'will be subject to effective inspection.'" 452 U.S. at 602-05, citing *Biswell*, 406 U.S. at 316. The Court upheld the Mine Safety Act's scheme of warrantless inspections of surface and underground mines.

*Donovan* is highly instructive but does not fully answer the Fourth Amendment question here, for *Donovan* concerned physical safety inspections of mines, not demands for production of medical and personnel files in mine custody. While *Donovan* found that the mining industry is sufficiently regulated to justify an exception from the warrant requirement, the fact that these document demands occur in the context of a pervasively regulated industry does not end the inquiry. Warrantless searches of pervasively regulated industries must still be reasonable. *Burger*, 482 U.S. at 702.

In determining whether a warrantless search of a closely-regulated enterprise pursuant to a regulatory scheme is reasonable, the Supreme Court has taught that such a search is reasonable if it satisfies three elements: the government has a substantial interest in the regulatory scheme prompting the search, a warrantless search is necessary to accomplish the goals of the regulatory scheme, and the regulatory scheme provides enough certainty and regularity to put business operators on notice and to limit individual agent discretion. See *Burger*, 482 U.S. at 701-03.

Although the parties have briefed the issue primarily in terms of warrantless searches, the distinct differences between the document demands here and unannounced physical inspections, as in *Donovan* or *Burger*, persuade us that the Fourth Amendment issues are better understood in terms of the law applicable to administrative subpoenas. In essence, what section 50.41 permits is not an intrusion in which government inspectors themselves open file cabinets and examine computer hard drives, but rather an administrative subpoena that requires mine operators to allow MSHA inspectors to review and keep copies of the records. The record demands meet the Fourth Amendment requirements for administrative subpoenas.

### a. *The Nature of MSHA's Record Demands*

Petitioners argue that the record demands here run afoul of the Fourth Amendment protections for commercial enterprises. The record demands here, however, are of a different nature than the challenged searches in the Supreme Court's cases delineating the Fourth Amendment's protections for closely-regulated industries. Most of those cases address physical inspections of commercial premises. See, *e.g.*, *Burger*, 482 U.S. at 712 (inspection of vehicle identification numbers at junkyard was excepted from warrant requirement after owner refused to permit officers to review his vehicle records); *Donovan*, 452 U.S. at 602 (warrantless physical inspection of mine for apparent safety violations as authorized by Mine Safety Act did not violate

Fourth Amendment); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 322-25 (1978) (entry into electrical and plumbing installation business to inspect for workplace safety conditions by OSHA inspector required warrant).

In this case, however, MSHA is not seeking to require mine operators to permit inspectors to enter mine operators' private offices and search through mine operators' file cabinets and computer files. Rather, MSHA seeks only to require the mine operators to provide certain documents. It is up to the mine operators themselves to search for, review, identify, and produce the responsive documents. For Fourth Amendment purposes, therefore, such demands are administrative subpoenas rather than physical searches carried out by government agents. See *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 195 (1946) (subpoenas requiring newspaper publishing companies to produce specified records that would determine compliance with Fair Labor Standards Act were not searches for Fourth Amendment purposes: "the records in these cases present no question of actual search and seizure, but raise only the question whether orders of court for the production of specified records have been validly made"); *RSM, Inc. v. Buckles*, 254 F.3d 61, 63, 69 (4th Cir. 2001) ("demand letters" from ATF requiring firearms licensees to "submit information concerning their firearms purchases and sales for the past three years" were "analogous to [ ] administrative subpoena[s]" and met the Fourth Amendment's requirements for such subpoenas).

Although the Mine Safety Act does not expressly refer to MSHA's document review power as the power to

issue an "administrative subpoena," the authority the Act confers upon MSHA amounts to an administrative subpoena in substance. It is the authority to inspect and copy specific documents in the possession of mine operators and the authority to issue citations and orders and impose penalties if mine operators do not cooperate. It is true that most administrative subpoenas are not self-executing, meaning that the agency cannot seek penalties for non-compliance until after a judicial officer has ordered compliance. But here, as we discuss further below, the Act provides mine operators with a variety of tools with which to defer and mitigate the imposition of penalties, thus mitigating the extent to which MSHA's document inspection demands may be more coercive than ordinary administrative subpoenas.

For purposes of our Fourth Amendment analysis, we look to the substance of MSHA's inspection power rather than how the Act nominally refers to those powers. And the power at issue here more closely resembles an administrative subpoena than a search or a seizure. A subpoena also implicates the Fourth Amendment, but only to the extent of requiring that the demand for in-formation be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *See v. City of Seattle*, 387 U.S. 541, 544 (1967). The record demands here satisfy these criteria.

First, the record demands are sufficiently limited in scope. The records demanded are limited to those that are necessary for MSHA to determine compliance

with 7000-1 and 7000-2 reports: personnel records to verify employee hours work and medical records to verify accurate injury and illness reporting. The demands are narrowly written so as to not require mine operators to produce records that would not aid MSHA in verifying compliance with Part 50 reporting requirements. Moreover, the demands cover relevant records from only one year. In light of these limits, the demands meet the first prong of the Fourth Amendment's requirements for administrative subpoenas.

Second, the record demands are relevant to the goals of the statutory scheme and the government's interest in miner safety. Congress has articulated a strong government interest in mine safety that drives the system of Part 50 audits and these demands for documents to verify compliance with other important regulatory requirements. When Congress passed the Mine Safety Act in 1977, it responded to a pressing need for tighter safety regulation of mines. See *Donovoan*, 452, U.S. at 602 ("it is undisputed that there is a substantial federal interest in improving the health and safety conditions in the Nation's underground and surface mines," and "Congress was plainly aware that the mining industry is among the most hazardous in the country").

The importance of miner safety remains strong today. Unfortunately, we need only look to the twenty-nine miners who died in the 2010 disaster at the Upper Big Branch mine — the "deadliest coal mine disaster this nation has experienced in forty years." See A Tragic Anniversary: Improving Safety at Dangerous Mines

One Year After Upper Big Branch: Hearing Before the
S. Comm. on Health, Education, Labor and Pensions,
112th Cong. 1 (2011) (statement of Joseph A. Main at 1,
Assistant Secretary of Labor for Mine Safety and Health).

An MSHA briefing following the Upper Big Branch
accident reveals the importance of accurate reporting
of safety violations. MSHA reported that in the years
preceding the accident, the number of safety violations
and citations for Upper Big Branch mine had increased
and were "not only [ ] more numerous than average,
they [were] also more serious." Briefing by Department
of Labor, Mine Safety and Health Administration on
Disaster at Massey Energy's Upper Big Branch Mine-
South at 4 (April 5, 2010). These numerous and serious
violations would have put Upper Big Branch into a
"pattern of violation" status (thus permitting heightened
scrutiny) in the year before the accident, but for an error
in MSHA's reporting system. Although this computer
error was a different kind of error than deliberate or
unintentional under-reporting of injuries on 7000-1 forms,
the error tragically illustrates the importance of ensuring
accurate reports of injuries and illnesses. Artificially
low injury rates and severity measures can cause MSHA
to miss mines that should otherwise be in POV status
and subject to more rigorous inspection and regulation.

Finally, the record demands are specific enough that it
will not be unreasonably burdensome for mine oper-
ators to comply with the demands. The letters MSHA
sent to mine operators specifically listed the documents
to be reviewed (*e.g.*, "All payroll records and time sheets

for all individuals working at your mine for the covered time period," Joint App. 32), and listed specific examples of the types of documents included in the demand:

> All medical records, doctor's slips, worker compensation filings, sick leave requests or reports, drug testing documents, emergency medical transportation records, and medical claims forms in your possession relating to accidents, injuries, or illnesses that occurred at the mine or may have resulted from work at the mine . . . .

*Id.* These demands are quite specific with regard to the type of records demanded (medical and payroll). While the medical record demand may require mine operators to sort between relevant and irrelevant medical records, the demand provides specific enough guidance so that any such sorting should not unreasonably burden mine operators. The demand sets a clear standard for which medical records are relevant: accidents, injuries, or illnesses, that *occurred at the mine* or *may have resulted from work at the mine*. Sorting between relevant and irrelevant medical records with this guidance should not be burdensome for mine operators, who are usually quite familiar with mine injuries and illnesses.

Thus, although the petitioners ask us to invalidate these demands as warrantless inspections offensive to the Fourth Amendment, we find that they are in substance administrative subpoenas and they satisfy the Fourth Amendment's requirements for such subpoenas.

2. *Miners*

In addition to the mine operators, the intervening miners also challenge the validity of the document demands on Fourth Amendment grounds, arguing that they have a constitutionally protected privacy interest in their personal medical records and that the regulatory mechanisms used by MSHA violate their Fourth Amendment rights by "attaching legal jeopardy to a refusal to produce confidential records without a prior opportunity for judicial review." Br. for Petitioners Bickett, et al., at 36.

We recognize the gravity of this concern. Medical records can contain some of the most private information about a person. Any scheme that puts those records in the hands of strangers, even a government agency, is a serious matter. Even though the demanded records are limited to those related to injuries and illnesses suffered due to mine work, we recognize that these records could reveal employees' medical history unrelated to mine work. For example, doctor's slips may contain information about multiple conditions, including conditions unrelated to mine work, and mine operators may choose to permit MSHA to inspect an entire file of medical records without first having mine personnel sort between relevant and irrelevant records.

Courts recognize that private medical records warrant some privacy protection under the Fourth Amendment. See *Whalen v. Roe*, 429 U.S. 589, 599-604 (1977) (acknowledging Fourth Amendment may protect "zone of privacy," which includes protection of "the individual

interest in avoiding disclosure of personal matters"); *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980) ("[t]here can be no question that an employee's medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection," generally basing this entitlement to privacy protection in a "not yet [ ] delineated" constitutional right to privacy as discussed in *Whalen*, 429 U.S. at 599-600).

The extent of the Fourth Amendment's protection in this area is not clear. In *Anderson v. Romero*, 72 F.3d 518 (7th Cir. 1995), we traced the history of the "legal concept of privacy" and noted that the "right to conceal one's medical history is readily derivable from the branch of the tort of invasion of privacy" in the common law, but that "[n]othing in the Fourth Amendment . . . bears directly on the interest in the privacy of one's medical records." *Id.* at 521-22. We found the best indication of such a right in *Whalen* and the cases that followed it, but noted that *Whalen* was "very vague" on the possibility of a constitutional right to the privacy of one's medical records. *Id.* at 522. (We ultimately held that neither the common law invasion of privacy nor the possible Fourth Amendment right to privacy of medical records could support a cause of action by a state prisoner against a prison officer who revealed to another guard that the prisoner had AIDS).

This is not the case in which to sort out this doctrinal ambiguity, as the record demands here do not come close to invading any privacy protection the Fourth

Amendment or the common law might offer. Cf. *National Aeronautics & Space Admin. v. Nelson*, 131 S. Ct. 746, 756-57 (2011) ("as was our approach in *Whalen*, we will assume for present purposes that the Government's challenged inquiries implicate a privacy interest of constitutional significance," holding that, "whatever the scope of this interest," it did not preclude the government from asking questions about treatment or counseling for illegal drug use on employment background question-naires otherwise protected from unwarranted disclosure by the Privacy Act), citing *Whalen*, 429 U.S. at 599, 605.

Any possible Fourth Amendment right to the privacy of the miners' medical records here is limited by the fact that when MSHA sought to inspect and copy the records, they were in the custody of the mines. In holding that a bank customer held no Fourth Amend-ment possessory interest in his bank records that the bank provided to government officials, the Supreme Court noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the infor-mation is revealed on the assumption that it will be used only for a limited purpose and the con-fidence placed in the third party will not be betrayed.

*United States v. Miller*, 425 U.S. 435, 443 (1976) (collecting cases).

Our court has similarly applied this principle. In *Young v. Murphy*, 90 F.3d 1225, 1236 (7th Cir. 1996), we affirmed

the district court's finding that qualified immunity protected investigators who inspected a deceased man's nursing home records, where his estate alleged that the deceased's Fourth Amendment rights were violated by the inspection. We found that "no such [Fourth Amendment] right has been clearly established," and that the estate alleged no facts showing that the deceased held a possessory interest in the inspected records, as "hospital records are typically the property of the hospital rather than a patient." *Id.* at 1236.

But some personal records are so private that, even when entrusted to another, an individual retains some amount of protection of the privacy of the records in the third party's custody. In *Whalen*, the Supreme Court implicitly acknowledged the possibility of a right against compulsory disclosure of a person's medical records to the government while upholding a New York law that required doctors to file with the state copies of every prescription for drugs deemed to have potential for abuse. 429 U.S. at 599-604. This right is not absolute, however. *Whalen* indicated that there are circumstances in which the government may obtain access to private personal records in third-party custody:

> disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to *public health agencies* are often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient. *Requiring such disclosure to representatives of the State having responsibility for the*

*health of the community, does not automatically amount to an impermissible invasion of privacy.*

429 U.S. at 602 (emphases added).

Whether the government can require banks, medical providers, or employers to turn over private medical records of customers, patients, or employees that are in their possession is a difficult question of balancing. The Third Circuit provided excellent guidance for this balancing in *United States v. Westinghouse Electric Corp.*, in which it considered whether OSHA could require an electric insulator manufacturing company to turn over all of its employees' medical records to determine the possible health effects of mold used to produce the insulators. 638 F.2d 570 (3d Cir. 1980). The court looked to several factors to balance the government's interest in public health against the privacy interests of the employees. Those factors included:

> the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Id.* at 578.

Based on our previous discussions, two of these factors — the need for access and whether there are

express statutory or regulatory mandates requiring access — weigh in favor of MSHA's access to the records.

Another of these factors — the precautions in place to protect the information from unauthorized disclosure to unintended parties — was emphasized by the Supreme Court in *Whalen* and seems especially significant here. In *Whalen* the Court noted that the government accumulates "vast amounts of personal information" and that the "right to collect and use such data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures." 429 U.S. at 605.

Here, this factor weighs in favor of MSHA's document demands. The mechanism for collecting information used here is accompanied by both statutory and regulatory duties for MSHA agents to keep the records confidential and avoid unwarranted disclosures. First, like all federal officials handling personal information, MSHA agents are bound by the Privacy Act not to disclose any personal information and to take certain precautions to keep personal information confidential. 5 U.S.C. § 552a(b) ("No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains . . . ."); see also 5 U.S.C. § 552a(c) (outlining accounting precautions agencies must take with regard to personal information); *U.S. Dep't of Navy v. Federal Labor Relations Auth.*, 975 F.2d 348, 350 (7th

Cir. 1992) (reiterating Privacy Act's requirement that federal officials not disclose personal information without consent).

Although there are exceptions to the Privacy Act's protection against disclosures, none of those exceptions change our determination. Some of the exceptions permit disclosures that would not be unwarranted in this circumstance. For example, exception (1) is for officers of the agency who need the records. Exception (3) is for disclosures for the purpose the information was collected. Exception (5) allows disclosure without any identifying information for purposes of statistical research. Exception (7) allows disclosure to other jurisdictions for law enforcement. And exception (8) allows disclosure in compelling circumstances "affecting the health or safety of an individual." One exception does not apply in this context: exception (6) for the National Archives, where the record has sufficient historical or other value.[1] See 5 U.S.C. § 552a(b).

The second exception allows disclosure of records required to be disclosed under the Freedom of Informa-

---

[1] Some of the exceptions would not be relevant for these types of documents: exception (4) for the census bureau, exception (9) for disclosure to Congress, and exception (12) for disclosure to a consumer reporting agency. Finally, one exception would inherently provide sufficient protection of miners' privacy interests: exception (11) allows disclosure pursuant to the order of a court of competent jurisdiction. 5 U.S.C. § 552a(b).

tion Act (FOIA). See Pub. L. No. 89-554, 80 Stat. 378, codified at 5 U.S.C. § 552 (FOIA); 5 U.S.C. § 552a(b)(2) (Privacy Act's second exception). The records demanded here, however, are not subject to disclosure under FOIA. They fall into FOIA's sixth exemption, for "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6); see also *U.S. Dep't of Navy*, 975 F.2d at 350. The medical records at issue here easily pass both parts of the analysis under FOIA exemption six. First, they are "personnel and medical files and similar files," and second, the individual privacy concerns the records implicate outweigh FOIA's purpose of "shed[ding] light on an agency's performance of its statutory duties." *U.S. Dep't of Defense v. Federal Labor Relations Auth.*, 510 U.S. 487, 497 (1994), citing *U.S. Dep't of Justice v. Reporters Committee for BB8 Freedom of Press*, 489 U.S. 749, 773 (1989); see also *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976) (exemption six "require[s] a balancing of the individual's right of privacy against the preservation of the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny") (internal quotation marks omitted).

The records demanded here are medical records. Absent extraordinary circumstances, it would be a violation of the miners' privacy if the records were revealed beyond the agency, and revealing individual miners' medical or personnel information would not advance public transparency of the operations of the Department of Labor or MSHA. See *Lakin Law Firm, P.C. v. F.T.C.*, 352

F.3d 1122, 1124 (7th Cir. 2003) ("[P]ersonal identifying information is regularly exempt from disclosure. And that is as it should be, for the core purpose of the FOIA is to expose what the government is doing, not what its private citizens are up to."); cf. *Rose*, 425 U.S. at 372 (case summaries of honor and ethics hearings in the military were not within exemption six after personal and other identifying information had been deleted); *U.S. Dep't of Navy*, 975 F.2d at 350 (union employees' names and addresses would fall under FOIA's exemption six); *Consumers' Checkbook Center for the Study of Services v. U.S. Dep't of Health and Human Services,* 554 F.3d 1046, 1050-56 (D.C. Cir. 2009) (physicians' Medicare receipts and financial records fall under exemption six).

Beyond the protection of the Privacy Act, the Secretary of Labor has adopted specific training and protocols to ensure the confidentiality of personal information. The Secretary implemented rules of conduct that require department employees, managers, contractors, licensees, certificate holders, and grantees to follow a set of rules designed to minimize any accidental disclosure of personal information (for example, not sharing passwords, not uploading, downloading, or transferring files with personal information, and immediately reporting theft). U.S. Dep't of Labor, Office of Chief Information Officer, Rules of Conduct and the Consequences for Failure to Follow Rules Concerning the Safeguarding of Personally Identifiable Information (April 25, 2011), Joint App. 96. The document lays out consequences for failure to follow the rules and has space

for the employee and supervisor to sign and date upon receipt of the policy and the related training.

The miners argue that these rules and protocols are insufficient because the Secretary implemented them after the initial records demands at issue here, but how recently they were adopted is not relevant to our analysis. We are convinced that any private medical or personnel information the Secretary or her agents obtain pursuant to these audits will be adequately protected.

Thus, despite the personal nature of the medical records demanded here, we find that the demands do not violate miners' privacy or Fourth Amendment rights because the government's need for the records outweighs the miners' privacy interest in the records, the records are no longer in the miners' custody, and the Privacy Act and MSHA's training and protocols adequately protect against unwarranted disclosure by MSHA agents. The warrantless demands for inspection of these records do not violate the Fourth Amendment rights of either the mine operators or the miners.

C.  *Due Process and Penalties*

Petitioners and amicus National Mining Association argue that the audit scheme violates mine operators' due process rights because it permits MSHA to impose daily penalties on mines not complying with the record demands before any opportunity for judicial review of the violations or demands.

MSHA proposed daily penalties for one mine, Peabody Midwest, after it failed to comply with the failure-to-

abate citations under 30 U.S.C. § 814(b) that MSHA issued when the mine refused to provide the documents. If a mine fails to correct a violation cited under section 814(b), section 815(b) authorizes the Secretary, through MSHA, to propose a penalty, and MSHA proposed penalties of $4,000 per day on Peabody Midwest, which were ultimately assessed. (Section 820(b) authorizes the Commission to assess proposed penalties for failure to correct a violation after a section 814(b) order.) Section 815(b)(1)(A) provides mines the opportunity to challenge the proposed assessment, in response to which the Commission must hold a hearing, and section 815(a)(1)(B) permits mines to request temporary relief from penalties. In determining whether to propose penalties, the statute directs the Secretary to consider: "[1] the operator's history of previous violations, [2] the appropriateness of such penalty to the size of the business of the operator charged, [3] whether the operator was negligent, [4] the effect on the operator's ability to continue in business, [5] the gravity of the violation, and [6] the demonstrated good faith of the operator charged in attempting to achieve rapid compliance after notification of a violation." Section 815(b)(2) accords with section 820(i), which instructs the Commission to consider the same factors in deciding whether to assess proposed penalties. § 820(i).

Congress intended this penalty scheme to provide swift, strong consequences for mines that failed to correct violations of mine safety rules and regulations. In passing the Mine Safety Act, Congress noted that the previous Coal Act's weak penalty scheme permitted

mines to pay their way through violations and citations, and that Congress intended to strengthen the penalty scheme to ensure that mines fully complied with health and safety standards. The Senate Committee Report noted:

> The assessment and collection of civil penalties under the Coal Act has also been a great disappointment to the Committee. The Committee firmly believes that the civil penalty is one of the single most effective mechanisms for insuring lasting and meaningful compliance with the law. . . . The Committee firmly believes that to effectively induce compliance, the penalty must be paid by the operator in reasonably close time proximity to the occurrence of the underlying violation.

S. Rep. No. 95-181, at 15-16 (1977), reprinted in 1977 U.S.C.C.A.N. 3401, 3415-16.

In addition to emphasizing the importance of strong penalties, the Senate committee also noted problems with the previous and weaker penalty scheme:

> Final determinations of penalties are not self-enforcing, and operators have the right to seek judicial review of penalty determinations, and may request a de novo trial on the issues in the U.S. District Courts. This encourages operators who are not predisposed to voluntarily pay assessed penalties to pursue cases through the elaborate administrative procedure and then to seek redress in the Courts.

*Id.* at 16, 1977 U.S.C.C.A.N. at 3416. Thus, Congress intended the scheme to allow MSHA to impose penalties

with teeth, which would actually induce mines to comply with MSHA's orders when it found a mine violated a health or safety rule.

Petitioners and amicus National Mining Association argue that this scheme impermissibly forces mine operators into an impossible choice — either they submit to violations of mine operators' and mine employees' privacy by allowing inspection of the records or they face staggering penalties that accumulate daily — all before review by an Article III court. They base this argument on *Ex parte Young*, 209 U.S. 123, 146-49 (1908). The *Young* case is best known these days for authorizing suits against state officials to require them to comply with federal law, despite the Eleventh Amendment to the Constitution. Here, however, we consider *Young* for its more specific facts.

The Supreme Court held unconstitutional a state statute that set railroad rates one-third lower than the going rates at the time, and that also imposed hefty financial and even criminal penalties for any person or corporation not abiding by the statutory rates. The Court noted: "[W]hen the penalties for disobedience are by fines so enormous and imprisonment so severe as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation, the result is the same as if the law in terms prohibited the company from seeking judicial construction of laws which deeply affect its rights." 209 U.S. at 147. Petitioners and amicus National Mining Association argue that the penalty scheme here is similarly flawed because, for mine operators to

challenge the validity of the demands in federal court, they must violate the orders and submit to daily penalties, which in this case have accumulated for over a year.

We do not find the procedures for imposing penalties here to be constitutionally flawed. As the Supreme Court noted in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the Mine Safety Act's procedures differ from the rate-setting scheme in *Ex parte Young* in three important respects. First, mine operators can contest and receive a hearing on proposed penalties and orders before they become final. See 30 U.S.C. § 815(b)(1)(A), (d). Second, mine operators can request that the Secretary delay imposing the penalties until further review. § 815(b)(2). Third, penalties are not automatic, but rather within the discretion of the Secretary to propose under § 815(b)(1)(B). See *Thunder Basin*, 510 U.S. at 217-18 (penalty scheme under Mine Safety Act does not involve "prehearing deprivation" comparable to *Ex parte Young*).

The mine operators here were able to take advantage of this flexibility. They contested the order and received a hearing before an ALJ, the Commission, and now this court. The Secretary granted their request that MSHA not assess any failure-to-abate penalties until after the disposition of the hearing before the ALJ, and the Commission granted the mine operators' request to expedite its review. Thus, we find that the penalties do not violate the mine operators' right to due process because the statutory scheme offered opportunities both for review and to mitigate the penalties.

Another important distinction is that the imposition of these penalties is discretionary, not automatic. The Mine Safety Act directs the Secretary and the Commission to take several factors into consideration before proposing and assessing penalties, including the size of the operator, its ability to continue business, and the gravity of the violation. 30 U.S.C. §§ 815(b)(2), 820(b)(2). The Secretary exercised discretion here and demonstrated appropriate fidelity to those factors. Of all the mines that received failure-to-abate orders, the Secretary ultimately imposed daily penalties on only one mine operator — Peabody Midwest. See Joint App. 92. In its letter notifying Peabody Midwest of the penalties, MSHA explained the rationale for proposing penalties according to all six criteria from section 815(b)(1), including that Peabody Midwest had a history of violations, that Peabody Midwest's violations reflected an "intentional decision not to comply" with the demands, and that MSHA had no information indicating that the penalties would put Peabody Midwest out of business. *Id*. at 93.

Thus, unlike the automatic penalties under the statute in *Ex parte Young*, which included time in prison, the Mine Safety Act requires the Secretary to consider the appropriateness of imposing a given penalty before proposing it, which provides an additional layer of process to mine operators. This comports with cases in which courts have found no *Ex parte Young* problem where, instead of automatic penalties, penalties depend on the party's rationale for refusing to pay. Cf. *Reisman v. Caplin*, 375 U.S. 440, 446-47 (1964) (tax statute requiring witnesses or taxpayers to appear in court

subject to contempt does not present *Ex parte Young* problem because criminal sanctions and fines do not apply when summonses are contested in good faith); *Solid State Circuits, Inc. v. EPA*, 812 F.2d 383, 388-92 (8th Cir. 1987) (CERCLA's treble damage penalty was not due process violation because statute permits agency not to impose penalty if party had "objectively reasonable basis" for believing order supporting penalties was "invalid or inapplicable," even where no opportunity for prior administrative hearing).

The procedures for proposing and assessing the penalties here under the Mine Safety Act did not violate mine operators' right to due process under the Fifth Amendment.

D.  *Conflict With Other Laws*

Petitioners and amicus National Mining Association argue that the audit scheme is invalid because it conflicts with other federal and state laws. They claim there are conflicts with the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101 *et seq.*, the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2601 *et seq.*, the Paperwork Reduction Act of 1980, 44 U.S.C. §§ 3501 *et seq.*, and Indiana and Illinois medical privacy laws. We find no conflict between MSHA's record demands and any of these laws.

1. *Paperwork Reduction Act*

Amicus National Mining Association argues that the Paperwork Reduction Act limits MSHA's authority to impose paperwork collection burdens on mines. See 44 U.S.C. §§ 3506(c), 3507 (requiring agencies to present estimates of burden of proposed paperwork collection from public to the Office of Management and Budget before making information requests). We lack jurisdiction to consider the argument because it was not raised before the Commission. See 30 U.S.C. § 816(a) ("No objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").

2. *The ADA and the FMLA*

Petitioners argue that requiring mine operators to comply with the record demands here conflicts with the ADA and the FMLA and may, under some circumstances, leave mine operators open to liability under those acts. Regulations promulgated under the ADA permit employers to use entrance medical examinations to screen potential employees and to require medical examinations of current employees to assess their ability to perform job-related functions. 29 C.F.R. § 1630.14(b), (c). The regulations require employees to treat the results of these examinations as "confidential medical record[s]," § 1630.14(b)(1), (c)(1), subject to three exceptions: for supervisors and managers who need to make accommodations, for first aid and safety personnel

if emergency treatment might be required, and for "[g]overnment officials investigating compliance with this part." § 1630.14(b)(1)(i)-(iii).

Regulations promulgated under the FMLA include a substantially similar provision: records and documents relating to employee medical histories that employers create or keep pursuant to the FMLA must be "maintained as confidential medical records." 29 C.F.R. § 825.500(g) (tracking language from and referencing ADA regulation 29 C.F.R. § 1630.14(b), (c)). The FMLA's confidentiality requirement contains exceptions for supervisors, managers, and first aid and safety personnel that are identical to the ADA's, and another for "government officials investigating compliance with FMLA (or other pertinent law[s])." § 825.500(g)(1)-(3).

None of these provisions conflicts with or should limit MSHA's authority to inspect and copy medical records here. These regulations merely state that if, in the course of their duties under the ADA and the FMLA, employers collect medical records on employees, those records must be treated as confidential. In our view, employee medical records that employers collect pursuant to the ADA or the FMLA will be kept confidential even if mine operators permit MSHA inspectors to inspect and copy them. As explained above, we read section 813 of the Mine Safety Act and corresponding regulation section 50.41 to permit MSHA to require mine operators to allow MSHA to inspect and copy employee medical records that may be relevant to work-related injuries or illnesses. Such inspection and

copying does not violate miners' privacy, in part because MSHA agents are bound by the Privacy Act to prevent unwarranted disclosure of their contents. Both of these holdings apply to all potentially relevant employee medical records, whether they would otherwise be subject to ADA or FMLA confidentiality requirements or not.

While the ADA's exemption does not expressly extend to "other pertinent law" as the FMLA's exemption does, the ADA regulations provide: "It may be a defense to a charge of discrimination under this part that a challenged action is required or necessitated by another Federal law or regulation . . . ." 29 C.F.R. § 1630.15(e). Thus, because the Mine Safety Act requires mine operators to permit MSHA agents to inspect and copy employee medical records relevant to mine-related injuries or illnesses, we see no conflict between the ADA's confidentiality requirement and MSHA's demands here. If in the future an agency responsible for enforcing the ADA tried to take action against a mine operator for following MSHA's orders to produce relevant documents, our doors would be open to resolve such a dispute.

For either the ADA or FMLA regulations to supersede MSHA's power to inspect records under the Mine Safety Act, the text of the ADA and the FMLA would need to say explicitly that Congress intended to limit the powers it had previously granted to MSHA. Neither law contains such language. See *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662-63 (2007) (collecting cases to support rule of statutory con-

struction that "repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal [is] clear and manifest," holding "[w]e will not infer a statutory repeal unless the later statute expressly contradict[s] the original act," and noting further that "a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum") (internal quotation marks omitted), citing *Watt v. Alaska,* 451 U.S. 259, 267 (1981); *Traynor v. Turnage,* 485 U.S. 535, 548 (1988); *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976).

Further, given the respective contexts of the ADA and FMLA's confidentiality requirements, petitioners' interpretation of those regulations is quite strained. It would mean that one agency could unilaterally limit other agencies' ability to collect information needed for their purposes. The FMLA, the more recent of the two laws, is written to avoid this anomalous result. Compare 29 C.F.R. § 825.500(g)(3) (third exception permits confidential records to be shared upon request with "Government officials investigating compliance with FMLA (*or other pertinent law*)" (emphasis added)), with 29 C.F.R. § 1630.14(b)(1)(iii) (ADA regulation permitting confidential records to be shared with "Government officials investigating compliance with this part"). The better interpretation is that the confidentiality requirements are added insurance that employers do not violate employees' privacy by sharing their medical records with unauthorized parties. But as we have already explained, sharing medical records with MSHA in this case does not violate miners' privacy,

regardless of the purpose for which the mine operators initially created or collected the records.

Finally, our analysis on this point is consistent with the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936, which requires health care providers to keep medical records confidential but contains exceptions for disclosures to government entities engaging in "public health activities" and for disclosures by a "public health authority that is authorized by law to collect or receive such information for the purpose of preventing or controlling disease, injury, or disability, including, but not limited to, the reporting of disease [and] injury." 45 C.F.R. § 164.512(b)(1)(i). This language aptly describes MSHA's role in these record demands — fulfilling its statutory obligation to protect miner health and safety by collecting information from mines regarding work-related injuries and illnesses. See also 65 Fed. Reg. 82462-01, 82624 (2000) (preamble to HIPAA regulations noting "[w]e agree that OSHA, MSHA and their state equivalents are public health authorities when carrying out their activities related to the health and safety of workers").

For these reasons we find that neither the ADA nor the FMLA limits MSHA's authority to require mine operators to permit MSHA agents to inspect and copy employee medical and records that are reasonably related to mine-related injuries and illnesses.

### 3. *State Laws*

Petitioners make a similar argument with regard to both Indiana and Illinois state laws — that they require mine operators to keep employee medical files confidential, and that complying with MSHA orders to permit its agents to inspect and copy such files would expose employers to liability. Petitioners point to several Indiana and Illinois laws, including portions of the Indiana Civil Rights Law, Ind. Code § 22-9-5-20(c)(2) (requiring employers to treat medical information as "a confidential medical record," with exceptions mirroring federal ADA, as part of prohibition of employment discrimination based on disability); 910 Ind. Admin. Code § 3-3-11(b), (f), (i) (regulations including similar provisions requiring medical information obtained by covered entities to be treated as "confidential medical record"), Illinois' Genetic Information Privacy Act, 410 Ill. Comp. Stat. 513/15, 40 ("genetic testing and information derived from genetic testing is confidential and privileged," and providing right of action for violation of the Act), and Illinois' A.I.D.S. Confidentiality Act, 410 Ill. Comp. Stat. 305/9 ("No person may disclose or be compelled to disclose the identity of any person upon whom a test is performed, or the results of such a test in a manner which permits identification of the subject of the test, except to the following persons: . . . .").

Our reasoning with regard to the ADA and the FMLA also applies to these provisions. In addition, of course, the alleged conflicts with these state law provisions could not present a problem under federal law because the

Mine Safety Act preempts any conflicting state law: "No State law in effect on December 30, 1969 or which may become effective thereafter shall be superseded by any provision of this chapter or order issued or any mandatory health or safety standard, except insofar as such State law is in conflict with this chapter or with any order issued or any mandatory health or safety standard." 30 U.S.C. § 955(a).

Petitioners argue that this section does not apply here because the Part 50 audits are not "mandatory health or safety standards." We need not resolve that question. Even if read as petitioners urge, the state laws would still conflict with the orders MSHA issued to the mine operators directing them to comply with the records demands. Section 955(a) preempts state laws conflicting with MSHA orders. In the event that an employer in Illinois or Indiana is required to permit MSHA agents to inspect and copy medical records that these laws deem "confidential," MSHA's order directing the mine operator to permit the inspection and copying would preempt the state law.

In sum, we do not find MSHA's record demands to conflict with the federal and state laws as petitioners and amicus National Mining Association argue. The Mine Safety Act preempts state privacy laws in the event of any conflict; the ADA and FMLA's confidentiality requirement would not be violated by disclosure to MSHA pursuant to these orders; and we do not have jurisdiction to consider whether the demands violate the PRA.

III. *Conclusion*

The records that MSHA seeks from mine operators are reasonably necessary for the agency to be able to fulfill its responsibility to protect miner safety and health. Without the records, significant numbers of mine-related injuries and illnesses may go unaccounted for, and mines operating under risky and hazardous conditions may continue to do so without sanction. While the petitioners raise important privacy concerns, Justice Holmes reminded us to "remember that the machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. v. Pinson*, 282 U.S. 499, 501 (1931). In light of the long history of mine accidents and illness, Congress has given the Secretary and MSHA powerful tools to protect miners. Those tools include the demands to inspect documents at issue here.

The petitions for review are DENIED.