UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-1374**

DICKENSON-RUSSELL COAL COMPANY, LLC,

        Petitioner,

      v.

SECRETARY OF LABOR; FEDERAL MINE SAFETY AND HEALTH REVIEW
COMMISSION,

        Respondents.

On Petition for Review of an Order of the Federal Mine Safety
and Health Review Commission.  (VA 2009-393-R; VA 2009-430)

Argued:  December 11, 2013        Decided:  March 27, 2014

Before TRAXLER, Chief Judge, and NIEMEYER and DUNCAN, Circuit
Judges.

Petition for review denied by published opinion.  Chief Judge
Traxler wrote the opinion, in which Judge Niemeyer and Judge
Duncan joined.

**ARGUED**: Patrick Wayne Dennison, JACKSON KELLY PLLC, Pittsburgh,
Pennsylvania, for Petitioner.  Samuel Charles Lord, UNITED
STATES DEPARTMENT OF LABOR, Arlington, Virginia, for
Respondents.  **ON BRIEF**: Ralph Henry Moore, II, JACKSON KELLY
PLLC, Pittsburgh, Pennsylvania, for Petitioner.  M. Patricia
Smith, Solicitor of Labor, Washington, D.C., Heidi W. Strassler,
Associate Solicitor, Office of Civil Penalty Compliance, MSHA,
W. Christian Schumann, Appellate Litigation, UNITED STATES

DEPARTMENT OF LABOR, Arlington, Virginia, for Respondent Secretary of Labor.

_____

TRAXLER, Chief Judge:

Dickenson-Russell Coal Company ("Dickenson Coal") was cited by the Secretary of Labor for violating the Federal Mine Safety and Health Act of 1977, see Pub. L. No. 95-164, 91 Stat. 1290, by failing to report an injury at its Roaring Fork No. 4 mine within ten days of its occurrence. Dickenson Coal contested the citation on the grounds that Bates Contracting and Construction, Inc. ("Bates"), a contractor that supplied miners to work the Roaring Fork No. 4 mine, had already reported the incident. An Administrative Law Judge ("ALJ") rendered a summary decision in the Secretary's favor, and the Federal Mine Safety and Health Review Commission (the "Commission") declined to exercise discretionary review of the ALJ's decision. Dickenson Coal now petitions this court for review. For the reasons that follow, we deny the petition.

I.

A.

In 1977, perceiving "an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines in order to prevent death and serious physical harm," 30 U.S.C. § 801(c), Congress significantly strengthened federal regulatory oversight of the mining industry by enacting the Federal Mine Safety and Health Act (the "Act"), see Donovan v. Dewey, 452

3

U.S. 594, 603 (1981) ("[T]he Mine Safety and Health Act applies to industrial activity with a notorious history of serious accidents and unhealthful working conditions" and "is specifically tailored to address those concerns."). Passage of the Act followed a series of tragic mining accidents from which Congress concluded that the then-existing regulatory scheme "had proven too weak" and that a major regulatory overhaul was necessary. Big Ridge, Inc. v. Fed. Mine Safety & Health Review Comm'n, 715 F.3d 631, 634 (7th Cir. 2013).[1]

Pursuant to the Act, the Secretary of Labor, acting through the Mine Safety and Health Administration ("MSHA"), see 29 U.S.C. § 557a, established "mandatory health [and] safety standards for the protection of life and prevention of injuries in coal or other mines," 30 U.S.C. § 811(a). To ensure compliance with these mandatory safety and health standards, the Act prescribes regular mine inspections by the MSHA, the frequency of which depends upon the type of mine being inspected. For underground mines, such as the Roaring Fork No. 4 mine, the MSHA is required to conduct inspections four times annually. See 30 U.S.C. § 813(a). In the event the MSHA finds

---

[1] Although mining accidents decreased after passage of the Act, Congress amended the Act in 2006, see MINER Act of 2006, Pub. L. No. 109-236, 120 Stat. 493, in the wake of another mining accident that produced numerous fatalities at the Sago Mine near Tallmansville, West Virginia.

4

a violation of the Act or of any mandatory health or safety regulation, it must issue a citation to the operator of the mine and order that corrective action be taken. See 30 U.S.C. § 814(a) (providing that the Secretary shall issue citations for violations of MSHA regulations and specify a "reasonable time for . . . abatement"). The Act defines a mine "operator" as "any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine." 30 U.S.C. § 802(d). The MSHA is further empowered in certain instances to issue an order of withdrawal requiring mining operations to cease until compliance is achieved, see 30 U.S.C. § 814(b), (d); id. § 817(a), and to assess civil penalties against an operator who has been found in violation of the Act or MSHA safety standards, see 30 U.S.C. § 815(a).

Despite the substantial regulatory oversight granted to the Secretary, however, Congress intended that "primary responsibility" for ensuring safe working conditions lie with the operators and the miners. 30 U.S.C. § 801(e); see Myers v. United States, 17 F.3d 890, 903-04 (6th Cir. 1994) (placing primary responsibility upon MSHA inspectors to maintain safe working conditions would be "manifestly unreasonable and unjustified" "[i]n light of the clear Congressional purpose to ensure that the primary responsibility for safety remains with

the mine owners and miners"). To that end, the Act imposes several affirmative duties upon mine operators, including the duty to notify the MSHA of "any accident occurring in any coal or other mine," 30 U.S.C. § 813(j); the duty to investigate any accident to determine its cause and establish measures to prevent a recurrence, see 30 U.S.C. § 813(d); and the duty to maintain and make available to the MSHA records of any such accident, see 30 U.S.C. § 813(d).

Our focus in this appeal is upon an operator's duty to report accidents to the MSHA. See 30 U.S.C. § 813(j). Pursuant to the Act, the Secretary adopted implementing regulations (the "Part 50 regulations") establishing a system governing an operator's statutorily required duty to report accidents, injuries, and illnesses occurring in its mine to the MSHA. See 30 C.F.R. Part 50. As mandated by these regulations,

> Each operator shall report each accident, occupational injury, or occupational illness at the mine. The principal officer in charge of health and safety at the mine or the supervisor of the mine area in which an accident or occupational injury occurs . . . shall complete or review [an MSHA Mine Accident, Injury, and Illness Report Form 7000-1]. . . . The operator shall mail completed forms to MSHA within ten working days after an accident or occupational injury occurs . . . .

30 C.F.R. § 50.20(a) (emphasis added). Accordingly, any person or entity qualifying as an "operator" under this regulation was required to report within 10 days accidents or injuries

6

occurring at the operator's mine by filing an MSHA Form 7000-1.[2] The Part 50 regulations include their own definition of the term "operator" that is identical to the statutory definition except that it does not expressly include "independent contractor" within the meaning of "operator." See 30 C.F.R. § 50.2(c)(1) ("As used in [Part 50] . . . Operator means . . . [a]ny owner, lessee, or other person who operates, controls, or supervises a coal mine."). There may be multiple "operators" engaged simultaneously at a single mine even though only one of them owns the mine. See Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n, 528 F.3d 310, 315 (4th Cir. 2008).

Part 50 reporting requirements serve both enforcement and administrative purposes. The local MSHA district office uses the Form 7000-1 to determine whether to conduct an investigation of the operation. See 30 C.F.R. § 50.11(a). The national MSHA Office of Injury and Employment Information compiles information from the reports to determine incident rates for every operator, see 30 C.F.R. § 50.1, and identifies operators in need of greater regulatory supervision.

_____

[2] Form 7000-1 requires the disclosure of general information such as the name of the mine in which the accident occurred and the MSHA identification number assigned to the mining operation; the name and identification number of the independent contractor, if any; and a summary description of the accident, including the date, time and location of the accident within the mine and a description of any resulting injuries.

7

B.

Dickenson Coal is the owner-operator of the Roaring Fork No. 4 Mine, an underground coal mine in southwestern Virginia. It is undisputed that Dickenson Coal is an "operator" subject to the reporting requirements under the Act and the regulations. See 30 U.S.C. § 802(d); 30 C.F.R. 50.20(a). Bates Contracting is a temporary labor agency that supplied miners to work at the Roaring Fork No. 4 mine. On May 9, 2009, Charlie Wood, an employee of Bates, was installing roof bolts when a portion of the coal "roof" fell and struck him on the elbow. The parties stipulated that Wood's accident resulted in a reportable "occupational injury" within the meaning of 30 C.F.R. § 50.2(e).[3] Although Wood was an employee of Bates, he was under the control and supervision of personnel from Dickenson Coal on the day of his occupational injury. There were no Bates employees at the Roaring Fork No. 4 mine who were supervising or could have supervised Wood's work.

On May 12, 2009, Bates, rather than Dickenson Coal, submitted a Form 7000-1 reporting Wood's occupational injury to the MSHA. Bates' 7000-1 form identified "Roaring Fork 4" as the "Mine Name," provided the proper MSHA identification number (44-

---

[3] Wood suffered an "occupational injury" because it required medical attention and resulted in Wood's temporary inability to perform his job duties. See 30 C.F.R. § 50.2(e).

8

07146) for the Roaring Fork No. 4 mining operation, and included its own contractor identification number. Dickenson Coal, however, did not file a Form 7000-1 or otherwise report Wood's injury. Dickenson Coal claimed that its policy at the time was not to report occupational injuries or illnesses suffered by an employee of an independent contractor like Bates.

On July 16, 2009, the MSHA issued a citation to Dickenson Coal for failure to timely report an occupational injury and file a Form 7000-1 as required by 30 C.F.R. § 50.20(a). The issuing MSHA inspector was aware that Bates submitted a Form 7000-1 but nonetheless found that Dickenson Coal was liable for failing to report the injury.[4] The MSHA also proposed a $127.00 civil penalty for the citation. Dickenson Coal subsequently

---

[4] In his Citation to Dickenson Coal, the inspector explained:

> The 7000-1 form was submitted by the contractor on 05/12/2009, under the contractor 3 digit Identification number, thus it was attributed to the Contractor's accident and injury history. The Mine's failure to complete and file the lost time accident report accurately, will result in a false Incidence Rate being assigned to the Mine Identification Number. The Mine's Incidence Rate will not reflect the true accident history for employees performing traditional mining jobs at this operation, thereby limiting the mine and regulatory agencies' ability to recognize and address accident trends.

J.A. 24-25.

9

abated the citation essentially by re-submitting the Form 7000-1 submitted by Bates with slight alterations.[5]

Dickenson Coal contested the citation before the Commission.  See 30 U.S.C. §§ 815(d), 823.[6]  The Secretary moved for summary disposition in light of the undisputed facts that Dickenson Coal is an operator under the Act and Part 50 regulations and that Wood suffered an "occupational injury" under 30 C.F.R. § 50.2(e).  The Secretary argued that Dickenson Coal's position that it was not required to report an injury to an independent contractor's employee was contrary to the plain language of the regulation, which requires "[e]ach operator" to report "each . . . occupational injury."  30 C.F.R. § 50.20(a). In response, Dickenson Coal argued that Bates also qualified as an "operator" within the meaning of 30 C.F.R. § 50.20(a), and therefore that either Bates or Dickenson Coal could have satisfied the obligation to report Wood's injury.  According to Dickenson Coal, the only sensible reading of the regulation was

_____

[5] The Form 7000-1 submitted by Dickenson Coal was simply a copy of Bates' Form 7000-1 with Bates' company name and Contractor Identification Number struck through, replaced by Dickenson Coal's name.  The signature of Bates' Human Resources official had also been struck and replaced with the signature of a Dickenson Coal employee.

[6] When an order is contested, an ALJ appointed by the Commission conducts an administrative hearing and renders a decision. 30 U.S.C. § 823(d)(1).

10

that only one of the operators, either Dickenson Coal or Bates but not both, was required to report the injury.

The ALJ granted "summary decision" to the Secretary. The ALJ rejected Dickenson Coal's argument that Bates qualified as an "operator" within the meaning of 30 C.F.R. § 50.20(a). The ALJ observed that although Bates might qualify as an "operator" under the statutory definition, see 30 U.S.C. § 802(d), it was the regulatory definition that controlled the meaning of the word "operator" in the Part 50 regulations. And, because Bates was not "operating, controlling or supervising" mining activities at Roaring Fork No. 4 mine when Wood was injured, the ALJ concluded that Bates did not meet the regulatory definition of "operator," 30 C.F.R. § 50.2(c)(1), and therefore was not obligated as an operator to "report each accident [or] occupational injury" within ten days, 30 C.F.R. § 50.20(a). Accordingly, the ALJ found that the Form 7000-1 filed by Bates to report the injury "was gratuitous in that it <u>did not relieve Dickenson of its [reporting] obligations</u> under section 50.20(a)." J.A. 75 (emphasis added). The ALJ was careful to limit his decision to cases where the independent contractor was not acting in a supervisory capacity, expressly leaving for another day the question of "the reporting responsibility of mine operators and contractors under section 50.20 when an

11

injury is sustained by a contract employee who is under the supervision and control of the contractor." J.A. 75.

Dickenson sought discretionary review of the ALJ's decision before the full Commission, but the Commission declined to exercise its review authority. See U.S.C. § 823(d)(2)(A)(i). Accordingly, the ALJ's decision constitutes the final decision of the Commission, see 30 U.S.C. § 823(d)(1), which is subject to review in this court, see 30 U.S.C. § 816(a)(1).

## II.

The issue presented to the court requires us to review an agency's interpretation of its own regulations. Accordingly, our analysis proceeds under Auer v. Robbins, 519 U.S. 452, 461 (1997), instead of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), which establishes the deferential framework for reviewing agency interpretations of statutes. See Shipbuilders Council of Am. v. U.S. Coast Guard, 578 F.3d 234, 242 (4th Cir. 2009) ("Chevron deference applies to an agency's interpretation of a statute while Auer deference applies to an agency's interpretation of its own regulation.") (internal quotation marks omitted).

Auer deference, like Chevron deference, "is warranted only when the language of the regulation is ambiguous." Christensen v. Harris Cnty., 529 U.S. 576, 588 (2000). When the "regulation in question [is] unambiguous, . . . adopting the agency's

12

contrary interpretation would permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation." Chase Bank USA v. McCoy, 131 S. Ct. 871, 882 (2011) (internal quotation marks omitted). Thus, our first task is to "determine whether the regulation itself is unambiguous; if so, its plain language controls." Ohio Valley Envtl. Coalition v. Aracoma Coal Co., 556 F.3d 177, 193 (4th Cir. 2009) (emphasis added).

If the regulation is ambiguous, we apply Auer deference, meaning that the agency's interpretation controls unless that interpretation is "plainly erroneous or inconsistent with the regulation." Auer, 519 U.S. at 461 (internal quotation marks and citation omitted); see Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (stating that courts must defer "unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation'"); Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 150–51 (1991) (explaining that the agency's interpretation of the regulation controls "so long as it is 'reasonable,' that is, so long as the interpretation 'sensibly conforms to the purpose and wording of the regulations'"(citation omitted)). Our review of the agency's interpretation in this context is therefore "highly deferential." Aracoma, 556 F.3d at 193.

III.

A.

Dickenson Coal raises two challenges to the ALJ's conclusion that it violated 30 C.F.R. § 50.20(a) by failing to file a Form 7000-1 with respect to Wood's injury. First, Dickenson Coal contends that the ALJ incorrectly concluded that the meaning of "operator" in 30 C.F.R. § 50.20(a), a regulation which is contained in the Part 50 regulations, is controlled by the regulatory definition of "operator" set forth in Part 50 rather than the statutory definition of "operator." Dickenson Coal argues that under the statutory definition, an independent contractor such as Bates is clearly an "operator." 30 U.S.C. § 802(d) (defining "operator" as "any owner, lessee, or other person who operates, controls, or supervises a coal or other mine <u>or any independent contractor performing services or construction at such mine</u>"). Building on the first argument, Dickenson Coal contends that when there is more than one "operator" who would be required under § 30 C.F.R. § 50.20(a) to report the same injury—as there would be if the statutory definition controls—the regulation requires only one of the operators, not both, to file a Form 7000-1 reporting the injury. Following this logic, Dickenson Coal concludes that because Bates in fact filed a Form 7000-1 reporting Wood's injury in a timely fashion, there was no violation. Stated differently,

14

Dickenson Coal contends that it was relieved of its obligation to report Wood's injury under § 50.20(a) when Bates filed the Form 7000-1 reporting it.

B.

Dickenson Coal devotes a substantial portion of its case to quarreling with the ALJ's decision not to use the statutory definition of "operator," which expressly includes "independent contractor[s]," but instead to utilize the regulatory definition of "operator," which does not. Dickenson Coal's obligation to report Wood's injury, however, does not depend upon whether Bates is considered an "operator" for purposes of 30 C.F.R. § 50.20(a). Even assuming Bates is an "operator," its filing of the Form 7000-1 injury report did not relieve Dickenson Coal of the obligation to file its own report.

Our analysis begins with the language of the regulation to "determine whether the regulation itself is unambiguous," Aracoma, 556 F.3d at 193, on the question of whether the filing of a Form 7000-1 by one operator to report an injury to MSHA relieves any other operator of its duty to file a Form 7000-1 with respect to the same injury. In relevant part, the regulation states:

> Each operator shall report each accident, occupational injury, or occupational illness at the mine. . . . The operator shall mail completed [MSHA Mine Accident, Injury, and Illness Report Form 7000-1s] to MSHA within ten working days after an accident or

15

> occupational injury occurs or an occupational illness is diagnosed.

30 C.F.R. § 50.20(a) (emphasis added). When construing statutes and regulations, we begin with the assumption that the words were meant to express their ordinary meaning. See INS v. Elias-Zacarias, 502 U.S. 478, 482 (1992). Here, the key phrases are "each operator" and "each accident." The ordinary meaning of the word "each" is "every one of two or more people or things considered separately." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/each (last visited Mar. 6, 2014) (emphasis added). According the regulation its regular and ordinary meaning, then, we read the regulation to mean that anyone who qualifies as an "operator" under 30 C.F.R. § 50.20(a) must report every qualifying accident or injury via the filing of a Form 7000-1. This language permits no exceptions; it is unconditional, and Dickenson Coal has failed to identify anything in the actual text of the regulation that suggests otherwise. Based on the plain language of the regulation, therefore, where there are two or more operators who are subject individually to the reporting requirement set forth in 30 C.F.R. § 50.20(a), every one of them must report every qualifying accident or injury.

Because the language of this regulation is not "susceptible to more than one plausible reading," we conclude that it is

16

unambiguous and that Auer deference is unwarranted. American Airlines, Inc. v. United States, 551 F.3d 1294, 1300 (Fed. Cir. 2008) ("When the language of a regulation is ambiguous or susceptible to more than one plausible reading, we defer to the agency's interpretation of its own regulations. . . ."). The "plain language controls" our reading of the reporting regulation, Aracoma, 556 F.3d at 193, and we conclude that the ALJ's decision was consistent with this language. Accordingly, we will not disturb the decision of the ALJ.

## C.

Finding nothing in the text of the actual regulation to support its argument, Dickenson Coal seeks to upend the plain language of the regulation by suggesting that our interpretation will lead to absurd results. See Forest Watch v. U.S. Forest Serv., 410 F.3d 115, 117 (2d Cir. 2005) ("The plain meaning of language in a regulation governs unless that meaning would lead to absurd results." (internal quotation and alteration marks omitted)). Dickenson Coal takes the position that a literal reading of the regulation results in unnecessary "double reporting" as exemplified by this case. Dickenson Coal points out that Bates supplied all the required information about Wood's injury to MSHA when it filed the Form 7000-1, and that its own subsequent filing of a report with MSHA added nothing new. In other words, Dickenson Coal argues that a plain

17

language interpretation creates a needlessly duplicative, and therefore absurd, reporting requirement.

Duplicative and unnecessary is not the same thing as absurd. Instances in which the court can disregard clear and unambiguous language because reading the regulation as written would produce absurd results "are, and should be, exceptionally rare." Sigmon Coal Co. v. Apfel, 226 F.3d 291, 304 (4th Cir. 2000), aff'd sub nom. Barnhart v. Sigmon Coal Co., 534 U.S. 993 (2001). Before we would conclude that the unambiguously plain meaning of a regulation leads to genuinely absurd results, we would have to be convinced that it was "patently inconceivable that the agency intended the result." Pacific Bell Tel. Co. v. California Pub. Utils. Comm'n, 621 F.3d 836, 848 (9th Cir. 2010) (internal quotation marks omitted).

There is nothing of the sort here. The Secretary has suggested plausible reasons for the regulation to require potentially overlapping or duplicative accident and injury reports. Requiring every operator to report to MSHA each time there is an accident reduces the likelihood that accidents and injuries will go unreported as a result of inadvertence or miscommunication between operators obligated to report the same accident or injury. In turn, if unreported incidents are minimized, the MSHA's "rates of injury occurrence" statistics for each operator will be more accurate. 30 C.F.R. § 50.1.

18

(directing the MSHA, using "information received under part 50," to "develop rates of injury occurrence"). The MSHA uses this statistical data to determine whether, for example, closer oversight is needed at a mine with a poor safety record. See Big Ridge, 715 F.3d at 636 ("MSHA designates a mine as having a 'pattern of violations' ('POV') when the mine has established a history of significant and substantial violations of mandatory safety or health standards. Once a mine is in POV status, MSHA has increased authority to institute safety precautions, which can involve burdensome administrative requirements and disruption of mine activities." (internal citations omitted)). Thus, the regulation's built-in reporting redundancy is anything but absurd. It ensures that accidents and injuries do not go unreported and that the MSHA is able to compile accurate statistics which promotes increased industry safety.

Moreover, the wide-sweeping "each operator" requirement precludes operators from shifting via private contract the duty to report accidents and injuries in their mines to independent contractors, such as Bates, that had no supervisory authority at the time of the accident or injury. Such shifting is undesirable in light of the fact that "[o]wner-operators are generally in continuous control of mine conditions" and more aware of the full circumstances surrounding a mining accident and also "more likely to know the federal safety and health

19

requirements." Speed Mining, 528 F.3d at 315 (internal quotation marks omitted) (holding that the Secretary may cite the owner-operator for violations of the Act committed by an independent contractor).

Dickenson Coal's last attempt to circumvent the unambiguous regulatory language is premised on regulatory history and general MSHA policy. Neither basis is compelling. Dickenson Coal's regulatory history argument focuses on the definition of "operator" and apparently is offered to convince the court that independent contractors such as Bates are operators who have a duty to report. This is of no value to Dickenson Coal, however, since we have assumed that premise to be true in rejecting the argument that Bates's filing of the Form 7000-1 relieved Dickenson Coal of its reporting obligation under 30 C.F.R. § 50.20(a). And, finally, Dickenson Coal argues the MSHA's own Program Policy Manual demonstrates that the regulation was not intended to elicit duplicate injury reports from multiple operators. The key portion of the Policy Manual directs independent contractors to "carefully coordinate their Part 50 reporting responsibilities" with the owner-operator "[i]n order to assure accurate reporting and recordkeeping and to avoid duplication." J.A. 65. This statement is not irreconcilably at odds with the reporting regulation because, as Dickenson itself has noted, "[d]epending on the employment circumstances of the

20

injured miner, one operator may have some information regarding the miner or the incident, while the other may have different information at its disposal." Br. of Appellant at 21. Coordination between operators is therefore necessary if each operator is to accurately report the injury to MSHA while minimizing the already slight duplication of effort caused when multiple operators gather the same information about a reportable injury before filing separate reports.

## IV.

For the foregoing reasons, we conclude that the unambiguous language of 30 C.F.R. § 50.20(a) imposed an unconditional duty upon the Dickenson-Russell Coal Company, owner-operator of the Roaring Fork No. 4 mine, to file within ten days a Form 7000-1 reporting the occupational injury Charlie Wood suffered at that mine. Dickenson Coal was not relieved of this duty when Wood's employer, Bates Contracting, timely filed a Form 7000-1 reporting the same incident. Accordingly, the petition for review is hereby denied.

<u>PETITION FOR REVIEW DENIED</u>

21