Reversed in part, vacated in part, and remanded by published opinion. Judge FLOYD wrote the opinion, in which Senior Judge DAVIS joined. Senior Judge DAVIS wrote a separate concurring opinion. Judge NIEMEYER wrote a separate opinion concurring in part and dissenting in part.
FLOYD, Circuit Judge:
G.G., a transgender boy, seeks to use the boys’ restrooms at his high school. After G.G. began to use the boys’ restrooms with the approval of the school administration, the local school board passed a policy banning G.G. from the boys’ rest *715 room. G.G. alleges that the school board impermissibly discriminated against him in violation of Title IX and the Equal Protection Clause of the Constitution. The district court dismissed G.G.’s Title IX claim and denied his request for a preliminary injunction. This appeal followed. Because we conclude the district court did not accord appropriate deference to the relevant Department of Education regulations, we reverse its dismissal of G.G.’s Title IX claim. Because we conclude that the district court used the wrong eviden-tiary standard in assessing G.G.’s motion for a preliminary injunction, we vacate its denial and remand for consideration under the correct standard. We therefore reverse in part, vacate in part, and remand the case for further proceedings consistent with this opinion.
I.
At the heart of this appeal is whether Title IX requires schools to provide transgender students access to restrooms congruent with their gender identity. Title IX provides: “[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.”. 20 U.S.C. § 1681(a). The Department of Education’s (the Department) regulations implementing Title IX permit the provision of “separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities for students of the other sex.” 34 C.F.R. § 106.33. In an opinion letter dated January 7, 2016, the Department’s Office for Civil Rights (OCR) interpreted how this regulation should apply to transgender individuals: “When a school elects to separate or treat students differently on the basis of sex ... a school generally must treat transgender students consistent with their gender identity.” J.A. 55. Because this case comes to us after dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), the facts below are generally as stated in G.G.’s complaint.
A.
G.G. is a transgender boy now in his junior year at Gloucester High School. G.G.’s birth-assigned sex, or so-called “biological sex,” is female, but G.G.’s gender identity is male. G.G. has been diagnosed with gender dysphoria, a medical condition characterized by clinically significant distress caused by an incongruence between a person’s gender identity and the person’s birth-assigned sex. Since the end of his freshman year, G.G. has undergone hormone therapy and has legally changed his name to G., a traditionally male name. G.G. lives all aspects of his life as a boy. G.G. has not, however, had sex reassignment surgery.[1]
Before beginning his sophomore year, G.G. and his mother told school officials that G.G. was a transgender boy. The officials were supportive and took steps to ensure that he would be treated as a boy by teachers and staff. Later, at G.G.’s request, school officials allowed G.G. to use the boys’ restroom.[2] G.G. used this rest *716 room without incident for about seven weeks. G.G.’s use of the boys’ restroom, however, excited the interest of others in the community, some of whom contacted the Gloucester County School Board (the Board) seeking to bar G.G. from continuing to use the boys’ restroom.
Board Member Carla B. Hook (Hook) added an item to the agenda for the November 11, 2014 board meeting titled “Discussion of Use of Restrooms/Locker Room Facilities.” J.A. 15. Hook proposed the following resolution (hereinafter the “transgender restroom policy” or “the policy”):
Whereas the GCPS [i.e., Gloucester County Public Schools] recognizes that some students question their gender identities, and
Whereas the GCPS encourages such students to seek support, advice, and guidance from parents, professionals and other trusted adults, and
Whereas the GCPS seeks to provide a safe learning environment for all students and to protect the privacy of all students, therefore
It shall be the practice of the GCPS to provide male and female restroom and locker room facilities in its schools, and the use of said facilities shall be limited to the corresponding biological genders, and students with gender identity issues shall be provided an alternative appropriate private facility.
J.A. 15-16; 58.
At the November 11, 2014 meeting twenty-seven people spoke during the Citizens’ Comment Period, a majority of whom supported Hook’s proposed resolution. Many of the speakers displayed hostility to G.G., including by referring pointedly to him as a “young lady.” J.A. 16. Others claimed that permitting G.G. to use the boys’ restroom would violate the privacy of other students and would lead to sexual assault in restrooms. One commenter suggested that if the proposed policy, were not adopted, non-transgender boys would come to school wearing dresses' in order to gain access to the girls’ restrooms. G.G. and his parents spoke against the proposed policy. Ultimately, the Board postponed a vote on the policy until its next meeting on December 9, 2014.
At the December 9 meeting, approximately thirty-seven people spoke during the Citizens’ Comment Period. Again, most of those who spoke were in favor of the proposed resolution. Some speakers threatened to vote the Board members out of office if the Board members voted against the proposed policy. Speakers again referred to G.G. as a “girl” or “young lady.” J.A. 18. One speaker called G.G. a “freak” and compared him to a person who thinks he is a “dog” and wants to urinate on fire hydrants. Id. Following this second comment period, the Board voted 6-1 to adopt the proposed policy, thereby barring G.G. from using the boys’ restroom at school.
G.G. alleges that he cannot use the girls’ restroom because women and girls in those facilities “react[ ] negatively because they perceive[] G.G. to be a boy.” Id. Further, using the girls’ restroom would “cause severe psychological distress” to G.G. and would be incompatible with his treatment for gender dysphoria. J.A. 19. As a corollary to the policy, the Board announced a series of updates to the school’s restrooms to improve general privacy for all students, including adding or expanding partitions between urinals in male restrooms, adding privacy strips to the doors of stalls in all restrooms, and constructing single-stall unisex restrooms available to all students. G.G. alleges that he cannot use these new unisex restrooms because they “make him feel even more stigmatized .... Being required to use the separate restrooms sets him apart from his peers, and serves as a daily re *717 minder that the school views him as ‘different.’ ” Id. G.G. further alleges that, because of this stigma and exclusion, his social transition is undermined and he experiences “severe and persistent emotional and social harms.” Id. G.G. avoids using the restroom while at school and has, as a result of this avoidance, developed multiple urinary tract infections.
B.
G.G. sued the Board on June 11, 2015. G.G. seeks an injunction allowing him to use the boys’ restroom and brings underlying claims that the Board impermissibly discriminated against him in violation of Title IX of the Education Amendments Act of 1972 and the Equal Protection Clause of the Constitution. On July 27, 2015, the district court held a hearing on G.G.’s motion for a preliminary injunction and on the Board’s motion to dismiss G.G.’s lawsuit. At the hearing, the district court orally dismissed G.G.’s Title IX claim and denied his request for a preliminary injunction, but withheld ruling on the motion to dismiss G.G.’s equal protection claim. The district court followed its ruling from the bench with a written order dated September 4, 2015 denying the injunction and a second written order dated September 17, 2015 dismissing G.G.’s Title IX claim and expanding on its rationale for denying the injunction.
In its September 17, 2015 order, the district court reasoned that Title IX prohibits discrimination on the basis of sex and not on the basis of other concepts such as gender, gender identity, or sexual orientation. The district court observed that the regulations implementing Title IX specifically allow schools to provide separate restrooms on the basis of sex. The district court concluded that G.G.’s sex was female and that requiring him to use the female restroom facilities did not impermissibly discriminate against him on the basis of sex in violation of Title IX. With respect to G.G.’s request for an injunction, the district court found that G.G. had not made the required showing that the balance of equities was in his favor. The district court found that requiring G.G. to use the unisex restrooms during the pen-dency of this lawsuit was not unduly burdensome and would result in less hardship than requiring other students made uncomfortable by G.G.’s presence in the boys’ restroom to themselves use the unisex restrooms. .
This appeal followed. G.G. asks us to reverse the district court’s dismissal of his Title IX claim, grant the injunction he seeks, and, because of comments made by the district judge during the motion hearing, to assign the case to a different district judge on remand. The Board, on the other hand, asks us to affirm the district court’s rulings and also asks us to'dismiss G.G.’s equal protection claim — on which the district court has yet to rule — as without merit. The United States, as it did below, has filed an amicus brief supporting G.G.’s Title IX claim in order to defend the government’s interpretation of Title IX as requiring schools to provide transgender students access to restrooms congruent with their gender identity.
II.
We turn first to the district court’s dismissal of G.G.’s Title IX claim.[3] *718 We review de novo the district court’s grant of a motion to dismiss. Cruz v. Maypa, 773 F.3d 138, 143 (4th Cir.2014). “To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citations and quotations omitted).
As noted earlier, Title IX provides: “[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.” 20 U.S.C. § 1681(a). To allege a violation of Title IX, G.G. must allege (1) that he was excluded from participation in an education program because of his sex; (2) that the educational institution was receiving federal financial assistance at the time of his exclusion; and (3) that the improper discrimination caused G.G. harm.[4] See Preston v. Virginia ex rel. New River Cmty. Coll., 31 F.3d 203, 206 (4th Cir.1994) (citing Cannon v. Univ. of Chi., 441 U.S. 677, 680, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)). We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX. Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007).
Not all distinctions on the basis of sex are impermissible under Title IX. For example, Title IX permits the provision of separate living facilities on the basis of sex: “nothing contained [in Title IX] shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes.” 20 U.S.C. § 1686. The Department’s regulations implementing Title IX permit the provision of “separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.” 34 C.F.R. § 106.33. The Department recently delineated how this regulation should be applied to transgender individuals. In an opinion letter dated January 7, 2015, the Department’s Office for Civil Rights (OCR) wrote: “When a school elects to separate or treat students differently on the basis of sex ... a school generally must treat transgender students consistent with their gender identity.”[5] J.A. 55.
*719 A.
G.G., and the United States as amicus curiae, ask us to give the Department’s interpretation of its own regulation controlling weight pursuant to Auer v. Robbins, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). Auer requires that an agency’s interpretation of its own ambiguous regulation be given controlling weight unless the interpretation is plainly erroneous or inconsistent with the regulation or statute. Id. at 461,117 S.Ct. 905. Agency interpretations need not be well-settled or long-standing to be entitled to deference. They must, however, “reflect the agency’s fair and considered judgment on the matter in question.” Id. at 462, 117 S.Ct. 905. An interpretation may not be the result of the agency’s fair and considered judgment, and will not be accorded Auer deference, when the interpretation conflicts with a prior interpretation, when it appears that the interpretation is no more than a convenient litigating position, or when the interpretation is a post hoc rationalization. Christopher v. SmithKline Beecham Corp., - U.S. -, 132 S.Ct. 2156, 2166, 183 L.Ed.2d 153 (2012) (citations omitted).
The district court declined to afford deference to the Department’s interpretation of 34 C.F.R. § 106.33. The district court found the regulation to be unambiguous because “[i]t clearly allows the School Board to limit bathroom access ‘on the basis of sex,’ including birth or biological sex.” G.G. v. Gloucester Cty. Sch. Bd., No. 4:15cv54, 132 F.Supp.3d 736, 745-46, 2015 WL 5560190, at *8 (E.D.Va. Sept. 17, 2015). The district court also found, alternatively, that the interpretation advanced by the Department was clearly erroneous and inconsistent with the regulation. The district court reasoned that, because “on the basis of sex” means, at most, on the basis of sex and gender together, it cannot mean on the basis of gender alone. Id.
The United States contends that the regulation clarifies statutory ambiguity by making clear that schools may provide separate restrooms for boys and girls “without running afoul of Title IX.” Br. for the United States as Amicus Curiae 24-25 (hereinafter “U.S. Br.”). However, the Department also considers § 106.33 itself to be ambiguous as to transgender students because “the regulation is silent on what the phrases ‘students of one sex’ and ‘students of the other sex’ mean in the context of transgender students.” Id. at 25. The United States contends that the interpretation contained in OCR’s January 7, 2015 letter resolves the ambiguity in § 106.33 as that regulation applies to transgender individuals.
B.
We will not accord an agency’s interpretation of an unambiguous regulation Auer deference. Thus, our analysis *720 begins with a determination of whether 34 C.F.R. § 106.33 contains an ambiguity. Section 106.33 permits schools to provide “separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.” 34 C.F.R. § 106.33.
“[Determining whether a regulation or statute is ambiguous presents a legal question, which we determine de novo.” Humanoids Grp. v. Rogan, 375 F.3d 301, 306 (4th Cir.2004). We determine ambiguity by analyzing the language under the three-part framework set forth in Robinson v. Shell Oil Co., 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). The plainness or ambiguity of language is determined by reference to (1) the language itself, (2) the specific context in which thát language is used, and (3) the broader context of the statute or regulation as a whole. Id. at 341, 117 S.Ct. 843.
First, we have little difficulty concluding that the language itself — “of one sex” and “of the other sex” — refers to male and female students. Second, in the specific context of § 106.33, the plain meaning of the regulatory language is best stated by the United States: “the mere act of providing separate restroom facilities for males and females does not violate Title IX .... ” U.S. Br. 22 n. 8. Third, the language “of one sex” and “of the other sex” appears repeatedly in the broader context of 34 C.F.R. § 106 Subpart D, titled “Discrimination on the Basis of Sex in Education Programs or Activities Prohibited.”[6] This repeated formulation indicates two sexes (“one sex” and “the other sex”), and the only reasonable reading of the language used throughout the relevant regulatory section is that it references male and female. Read plainly then, § 106.33 permits schools to provide separate toilet, locker room, and shower facilities for its male and female students. By implication, the regulation also permits schools to exclude males from the female facilities and vice-versa.
Our inquiry is not ended, however, by this straightforward conclusion. Although the regulation may refer unambiguously to males and females, it is silent as to how a school should determine whether a transgender individual is a male or female for the purpose of access to sex-segregated restrooms. We conclude that the regulation is susceptible to more than one plausible reading because it permits both the Board’s reading — determining maleness or femaleness with reference exclusively to genitalia — and the Department’s interpretation — determining maleness or femaleness with reference to gender identity. Cf. Dickenson-Russell Coal Co. v. Sec’y of Labor, 747 F.3d 251, 258 (4th Cir.2014) (refusing to afford Auer deference where the language of the regulation at issue was “not susceptible to more than one plausible reading” (citation and quotation marks omitted)). It is not clear to us how the regulation would apply in a number of situations — even under the Board’s own “biological gender” formulation. For example, which restroom would a transgender individual who had undergone sex- *721 reassignment surgery use? What about an intersex individual? What about an individual born with X-X-Y sex chromosomes? What about an individual who lost external genitalia in an accident? The Department’s interpretation resolves ambiguity by providing that in the case of a transgender individual using a sex-segregated facility, the individual’s sex as male or female is to be generally determined by reference to the student’s gender identity.
C.
Because we conclude that the regulation is ambiguous as applied to transgender individuals, the Department’s interpretation is entitled to Auer deference unless the Board demonstrates that the interpretation is plainly erroneous or inconsistent with the regulation or statute. Auer, 519 U.S. at 461, 117 S.Ct. 905. “Our review of the agency’s interpretation in this context is therefore highly deferential.” Dickenson-Russell Coal, 747 F.3d at 257 (citation and quotation marks omitted). “It is well established that an agency’s interpretation need not be the only possible reading of a regulation — or even the best one — to prevail.” Decker v. Nw. Envtl. Def. Ctr., — U.S.-, 133 S.Ct. 1326, 1337, 185 L.Ed.2d 447 (2013). An agency’s view need only be reasonable to warrant deference. Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991) (“[I]t is axiomatic that the [agency’s] interpretation need not be the best or most natural one by grammatical or other standards. Rather, the [agency’s] view need be only reasonable to warrant deference.”).
Title IX regulations were promulgated by the Department of Health, Education, and Welfare in 1975 and were adopted unchanged by the Department in 1980. 45 Fed.Reg. 30802, 30955 (May 9,1980)., Two dictionaries from the drafting era inform our analysis of how the term “sex” was understood at that time. The first defines “sex” as “the character of being either male or female” or “the sum of those anatomical and physiological differences with reference to which the male and female are distinguished.... ” American College Dictionary 1109 (1970). The second defines “sex” as:
the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change, that in its typical dichotomous occurrence is usu[ally] genetically controlled and associated with special sex chromosomes, and that is typically manifested as maleness and femaleness ....
Webster’s Third New International Dictionary 2081 (1971).
Although these definitions suggest that the word “sex” was understood at the time the regulation was adopted to connote male and female and that maleness and femaleness were determined primarily by reference to the factors the district court termed “biological sex,” namely reproductive organs, the definitions also suggest that a hard-and-fast binary division on the basis of reproductive organs — although useful in most cases — was not universally descriptive.[7] The dictionaries, therefore, used qualifiers such as reference to the “sum of’ various factors, “typical dichotomous occurrence,” and “typically manifest *722 ed as .maleness and femaleness.” Section 106.33 assumes a student population composed of individuals of what has traditionally been understood as the usual “dichotomous occurrence” of male and female where the various indicators of sex all point in the same direction. It sheds little light on how exactly to determine the “character of being either male or female” where those indicators diverge. We conclude that the Department’s interpretation of how § 106.33 and its underlying assumptions should apply to transgender individuals is not plainly erroneous or inconsistent with the text of the regulation. The regulation is silent as to which restroom transgender individuals are to use when a school elects to provide sex-segregated restrooms, and the Department’s interpretation, although perhaps not the intuitive one, is permitted by the varying physical, psychological, and social aspects — or, in the words of an older dictionary, “the morphological, physiological, and behavioral peculiarities” — included in the term “sex.”
D.
Finally, we consider whether the Department’s interpretation of § 106.33 is the result of the agency’s fair and considered judgment. Even a valid interpretation will not be accorded Auer deference where it conflicts with a prior interpretation, where it appears that the interpretation is no more than a convenient litigating position, or where the interpretation is a post hoc rationalization. Christopher, 132 S.Ct. at 2166 (citations omitted).
Although the Department’s interpretation is novel because there was no interpretation as to how § 106.33 applied to transgender individuals before January 2015, “novelty alone is no reason to refuse deference” and does not render the current interpretation inconsistent with prior agency practice. See Talk Am., Inc. v. Mich. Bell Tel. Co., 564 U.S. 50, 131 S.Ct. 2254, 2263, 180 L.Ed.2d 96 (2011). As the United States explains, the issue in this case “did not arise until recently,” see id., because schools have only recently begun citing § 106.33 as justification for enacting new policies restricting transgender students’ access to restroom facilities. The Department contends that “[i]t is to those ‘newfound’ policies that [the Department’s] interpretation of the regulation responds.” U.S. Br. 29. We see no reason to doubt this explanation. See Talk Am., Inc., 131 S.Ct. at 2264.
Nor is the interpretation merely a convenient litigating position. The Department has consistently enforced this position since 2014. See J.A. 55 n. 5 & n. 6 (providing examples of OCR enforcement actions to secure transgender students access to restrooms congruent with their gender identities). Finally, this interpretation cannot properly be considered a post hoc rationalization because it is in line with the existing guid-ances and regulations of a number of federal agencies — all of which provide that transgender individuals should be permitted access to the restroom that corresponds with their gender identities.[8] U.S. Br. 17 n. 5 & n. 6 (citing publica *723 tions by the Occupational Safety and Health Administration, the Equal Employment Opportunity Commission, the Department of Housing and Urban Development, and the Office of Personnel Management). None of the Christopher grounds for withholding Auer deference are present in this case.
E.
We conclude that the Department’s interpretation of its own regulation, § 106.33, as it relates to restroom access by transgender individuals, is entitled to Auer deference and is to be accorded controlling weight in this case.[9] We reverse the district court’s contrary conclusion and its resultant dismissal of G.G.’s Title IX claim.
F.
In many respects, we are in agreement with the dissent. We agree that “sex” should be construed uniformly throughout Title IX and its implementing regulations. We agree that it has indeed been commonplace and widely accepted to separate public restrooms, locker rooms, and shower facilities on the basis of sex. We agree that “an individual has a legitimate and important interest in bodily privacy such that his or her nude or partially nude body, genitalia, and other private parts” are not involuntarily exposed.[10] Post at 734. It is not apparent to us, however, that the truth of these propositions undermines the conclusion we reach regarding the level of deference due to the Department’s interpretation of its own regulations.
The Supreme Court commands the use of particular analytical frameworks when courts review the actions of the executive agencies. G.G. claims that he is entitled to use the boys’ restroom pursuant to the Department’s interpretation of its regulations implementing Title IX. We have carefully followed the Supreme Court’s guidance in Chevron, Auer, and Christopher and have determined that the interpretation contained in the OCR letter is to be accorded controlling weight. In a case such as this, where there is no constitutional challenge to the regulation or agency interpretation, the weighing of privacy interests or safety concerns[11] — fundamen *724 tally questions of policy — is a task committed to the agency, not to the courts.
The Supreme Court’s admonition in Chevron points to the balance courts must strike:
Judges are not experts in the field, and are not part of either political branch of the Government. Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges’ personal policy preferences. In contrast, an agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration’s views of wise policy to inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices — resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.
Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 865-66, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Not only may a subsequent administration choose to implement a different policy, but Congress may also, of course, revise Title IX explicitly to prohibit or authorize the course charted here by the Department regarding the use of restrooms by transgender students. To the extent the dissent critiques the result we reach today on policy grounds, we reply that, our Auer analysis complete, we leave policy formulation to the political branches.
III.
G.G. also asks us to reverse the district court’s denial of the preliminary injunction he sought which would have allowed him to use the boys’ restroom during the pendency of this lawsuit. “To win such a preliminary injunction, Plaintiffs must demonstrate that (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest.” League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 236 (4th Cir.2014) (citation omitted). We review a district court’s denial of a preliminary injunction for abuse of discretion. Id. at 235. “A district court has abused its discretion if its decision is guided by erroneous legal principles or rests upon a clearly erroneous factual finding.” Morris v. Wachovia Sec., Inc., 448 F.3d 268, 277 (4th Cir.2006) (citation and quotations omitted). “We do not ask whether we would have come to the same conclusion as the district court if we were examining the matter de novo.” Id. (citation omitted). Instead, “we reverse for abuse of discretion if we form a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.” Id. (citations and quotations omitted).
The district court analyzed G.G.’s request only with reference to the third factor — the balance of hardships — and found that the balance of hardships did not weigh in G.G.’s favor. G.G. submitted two declarations in support of his complaint, one *725 from G.G. himself and one from a medical expert, Dr. Randi Ettner, to explain what harms G.G. will suffer as a result of his exclusion from the boys’ restroom. The district court refused to consider this evidence because it was “replete with inadmissible evidence including thoughts of others, hearsay,' and suppositions.” G.G., 132 F.Supp.3d at 748, 2015 WL 5560190, at *11.
The district court misstated the evidentiary standard governing preliminary injunction hearings. The district court stated: “The complaint is no longer the deciding factor, admissible evidence is the deciding factor. Evidence therefore must conform to the rules of evidence.” Id. at 747, 2015 WL 5560190, at *9. Preliminary injunctions, however, are governed by less strict rules of evidence:
The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.
Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); see also Elrod v. Burns, 427 U.S. 347, 350 n. 1, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (taking as true the “well-pleaded allegations of respondents’ complaint and uncon-troverted affidavits filed in support of the motion for a preliminary injunction”); compare Fed.R.Civ.P. 56 (requiring affidavits supporting summary judgment to be “made on personal knowledge, [and to] set out facts that would be admissible in evidence”), with Fed. R. Civ. P. 65 (providing no such requirement in the preliminary injunction context). Thus, although admissible evidence may be more persuasive than inadmissible evidence in the preliminary injunction context, it was error for the district court to summarily reject G.G.’s proffered evidence because it may have been inadmissible at a subsequent trial.
Additionally, the district court completely excluded some of G.G.’s proffered evidence on hearsay grounds. The seven of our sister circuits to have considered the admissibility of hearsay in preliminary injunction proceedings have decided that the nature of evidence as hearsay goes to “weight, not preclusion” and have permitted district courts to “rely on hearsay evidence for the limited purpose of determining whether to award a preliminary injunction.” Mullins v. City of New York, 626 F.3d 47, 52 (2d Cir.2010); see also Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 718 (3d Cir.2004); Ty, Inc. v. GMA Accessories, Inc., 132 F.3d 1167, 1171 (7th Cir.1997); Levi Strauss & Co. v. Sunrise Int'l Trading, Inc., 51 F.3d 982, 985 (11th Cir.1995) (“At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding.” (citation and internal quotations omitted)); Sierra Club, Lone Star Chapter v. FDIC, 992 F.2d 545, 551 (5th Cir.1993) (“[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence.”); Asseo v. Pan Am. Grain Co., Inc., 805 F.2d 23, 26 (1st Cir.1986); Flynt Distrib. Co., Inc. v. Harvey, 734 F.2d 1389, 1394 (9th Cir.1984). We see no reason for a different rule to govern in this Circuit. Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual *726 evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted.
Because the district court evaluated G.G.’s proffered evidence against a stricter evidentiary standard than is warranted by the nature and purpose of preliminary injunction proceedings to prevent irreparable harm before a full trial on the merits, the district court was “guided by erroneous legal principles.” We therefore conclude that the district court abused its discretion when it denied G.G.’s request for a preliminary injunction without considering G.G.’s proffered evidence. We vacate the district court’s denial of G.G.’s motion for a preliminary injunction and remand the case to the district court for consideration of G.G.’s evidence in light of the evidentiary standards set forth herein.
IV.
Finally, G.G. requests that we reassign this case to a different district judge on remand. G.G. does not explicitly claim that the district judge is biased. Absent such a claim, reassignment is only appropriate in “unusual circumstances where both for the judge’s sake and the appearance of justice an assignment to a different judge is salutary and in the public interest, especially as it minimizes even a suspicion of partiality.” United States v. Guglielmi, 929 F.2d 1001, 1007 (4th Cir.1991) (citation and internal quotation marks omitted). In determining whether such circumstances exist, a court should consider: (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. Id. (citation omitted).
G.G. argues that both the first and second Guglielmi factors are satisfied. He contends that the district court has preexisting views which it would be unwilling to put aside in the face of contrary evidence about medical science generally and about “gender and sexuality in particular.” Appellant’s Br. 53. For example, the court accepted the Board’s “mating” concern by noting:
There are only two instincts — two. Everything else is acquired — everything. That is, the brain only has two instincts. One is called self-preservation, and the other is procreation. And procreation is the highest instinct in individuals who are in the latter part of their teen-age years. All of that is accepted by all medical science, as far as I can determine in reading information.
J.A. 85-86.
The district court also expressed skepticism that medical science supported the proposition that one could develop a urinary tract infection from withholding urine for too long. J.A. 111-12. The district court characterized gender dysphoria as a “mental disorder” and resisted several attempts by counsel for G.G. to clarify that it only becomes a disorder when left untreated. See J.A. 88-91; 101-02. The district court also seemed to reject G.G.’s representation of what it meant to be transgender, repeatedly noting that G.G. “wants” to be a boy and not a girl, but that “he is biologically a female.” J.A. 103-04; see also J.A. 104 (“It’s his mind. It’s not physical that causes that, it’s what he believes.”). The district court’s memorandum opinion, however, included none of the extraneous remarks or suppositions that marred the hearing.
*727 Reassignment is an unusual step at this early stage of litigation. Although the district court did express opinions about medical facts and skepticism of G.G.’s claims, the record does not clearly indicate that the district judge would refuse to consider and credit sound contrary evidence. Further, although the district court has a distinct way of proceeding in court, the hearing record and the district court’s written order in the case do not raise in our minds a question about the fundamental fairness of the proceedings, however idiosyncratic. The conduct of the district judge does not at this point satisfy the Guglielmi standard. We deny G.G.’s request for reassignment to a different district judge on remand.
V.
For the foregoing reasons, the judgment of the district court is

REVERSED IN PART, VACATED IN PART, AND REMANDED.

. The World Professional Association for Transgender Health (WPATH) has established Standards of Care for individuals with gender dysphoria. J.A. 37. These Standards of Care are accepted as authoritative by organizations such as the American Medical Association and the American Psychological Association. Id. The WPATH Standards of Care do not permit sex reassignment surgery for persons who are under the legal age of majority. J.A. 38.

. G.G. does not participate in the school’s physical education programs. He does not seek here, and never has sought, use of the boys’ locker room. Only restroom use is at issue in this case.

. We decline the Board’s invitation to preemptively dismiss G.G.’s equal protection claim before it has been fully considered by the district court. ”[W]e are a court of review, not of first view.” Decker v. Nw. Envtl. Def. Ctr.,-U.S.-, 133 S.Ct. 1326, 1335, 185 L.Ed.2d 447 (2013) (citation and quotation marks omitted). We will not proceed to the merits of G.G.’s equal protection claim on appeal without the benefit of the district court’s prior consideration.

. The Board suggests that a restroom may not be educational in nature and thus is not an educational program covered by Title IX. Ap-pellee's Br. 35 (quoting Johnston v. Univ. of Pittsburgh, 97 F.Supp.3d 657, 682 (W.D.Pa.2015)). The Department's regulation pertaining to "Education programs or activities" provides:
Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:
(1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service;
(2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner;
(3) Deny any person any such aid, benefit, or service;
(7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.
34 C.F.R. § 106.31(b). We have little difficulty concluding that access to a restroom at a school, under this regulation, can be considered either an "aid, benefit, or service” or a "right, privilege, advantage, or opportunity,” which, when offered by a recipient institution, falls within the meaning of "educational program” as used in Title IX and defined by the Department’s implementing regulations.

. The opinion letter cites to OCR’s December 2014 "Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities.” This document, denoted a "significant guidance document” per Office of Management and Budget regulations, states: "All students, in- *719 eluding transgender students and students who do not conform to sex stereotypes, are protected from sex-based discrimination under Title IX. Under Title IX, a recipient generally must treat transgender students consistent with their gender identity in all aspects of the planning, implementation, enrollment, operation, and evaluation of single-sex classes.” Office of Civil Rights, Dept, of Educ., Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities 25 (2014) available at http://www2.ed.gov/abou1/offices/list/ocr/docs/ faqs-title-ix-single-sex-201412 .pdf.
The dissent suggests that we ignore the part of OCR's opinion letter in which the agency "also encourages schools to offer the use of gender-neutrál, individual-user facilities to any student who does not want to use shared sex-segregated facilities,” as the Board did here. Post at 738. However, because G.G. does want to use shared sex-segregated facilities, the agency's suggestion regarding students who do not want to use such shared sex-segregated facilities is immaterial to the resolution of G.G.’s claim. Nothing in today’s opinion restricts any school’s ability to provide individual-user facilities.

. For example, § 106.32(b)(2) provides that “[h]ousing provided ... to students of one sex, when compared to that provided to students of the other sex, shall be as a whole: proportionate in quantity ... and [cjompara-ble in quality and cost to the student”; § 106.37(a)(3) provides that an institution generally cannot "[ajpply any rule ... concerning eligibility [for financial assistance] which treats persons of one sex differently from persons of the other sex with regard to marital or parental status”; and § 106.41(b) provides that “where [an institution] operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex ... members of the excluded sex must be allowed to try-out for the team offered ....”

. Modern definitions of "sex” also implicitly recognize the limitations of a nonmalleable, binary conception of sex. For example, Black’s Law Dictionary defines “sex” as "[t]he sum of the peculiarities of structure and function that distinguish a male from a female organism; gender.” Black’s Law Dictionary 1583 (10th ed.2014). The American Heritage Dictionary includes in the definition of “sex” "[o]ne’s identity as either female or male.” American Heritage Dictionary 1605 (5th ed.2011).

. We disagree with the dissent’s suggestion that the result we reach today renders the enforcement of separate restroom facilities impossible because it "would require schools to assume gender identity based on appearances, social expectations, or explicit declarations of identity.” Post at 737. Accepting the Board’s position would equally require the school to assume “biological sex" based on "appearances, social expectations, or explicit declarations of [biological sex].” Certainly, no one is suggesting mandatory verification of the "correct” genitalia before admittance to a restroom. The Department’s vision of sex-segregated restrooms which takes account of gender identity presents no greater "impossibility of enforcement” problem than does the *723 Board’s “biological gender” vision of sex-segregated restrooms.

. The Board urges us to reach a contrary conclusion regarding the validity of the Department’s interpretation, citing Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ., 97 F.Supp. 657 (W.D.Pa.2015). Although we recognize that the Johnston court confronted a case similar in most material facts to the one before us, that court did not consider the Department’s interpretation of § 106.33. Because the Johnston court did not grapple with the questions of administrative law implicated here, we find the Title IX analysis in Johnston to be unpersuasive.

. We doubt that G.G.’s use of the communal restroom of his choice threatens the type of constitutional abuses present in the cases cited by the dissent. For example, G.G.’s use— or for that matter any individual’s appropriate use — of a restroom will not involve the type of intrusion present in Brannum v. Overton Cty. Sch. Bd., 516 F.3d 489, 494 (6th Cir.2008) (involving the videotaping of students dressing and undressing in school locker rooms), Beard v. Whitmore Lake Sch. Dist., 402 F.3d 598, 604 (6th Cir.2005) (involving the indiscriminate strip searching of twenty male and five female students), or Sepulveda v. Ramirez, 967 F.2d 1413, 1416 (9th Cir.1992) (involving a male parole officer forcibly entering a bathroom stall with a female parolee to supervise the provision of a urine sample).

.The dissent accepts the Board’s invocation of amorphous safety concerns as a reason for refusing deference to the Department’s interpretation. We note that the record is devoid of any evidence tending to show that G.G.’s use of the boys’ restroom creates a safety issue. We also note that the Board has been, perhaps deliberately, vague as to the nature of the safety concerns it has — whether it fears that it cannot ensure G.G.'s safety while in the restroom or whether it fears G.G. himself is a *724 threat to the safety of others in the restroom. We are unconvinced of the existence of danger caused by “sexual responses prompted by students’ exposure to the private body parts of students of the other biological sex.” Post at 735. The same safety concern would seem to require segregated restrooms for gay boys and girls who would, under the dissent’s formulation, present a safety risk because of the "sexual responses prompted” by their exposure to the private body parts of other students of the same sex in sex-segregated restrooms.